Randall K. Rathbun #09765
Dylan P. Wheeler #28661
8301 E. 21st Street N., Suite 450
Wichita, Kansas 67206-2936
Telephone: (316) 262-4000
Email: randy@depewgillen.com
dylan@depewgillen.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| CARLOS E. MORAL and<br>JULIE K. MORAL,<br><br>         Plaintiffs,<br><br>v.<br><br>PHH MORTGAGE CORPORATION;<br>OCWEN LOAN SERVICING, LLC;<br>BANK OF NEW YORK MELLON<br>TRUST COMPANY, NATIONAL<br>ASSOCIATION; and INDECOMM<br>HOLDINGS, INC. d/b/a INDECOMM<br>GLOBAL SERVICES,<br><br>         Defendants. | )<br>)<br>)<br>)<br>)<br>)  Case No. 6:21-cv-01070-HLT-TJJ<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## FIRST AMENDED COMPLAINT

COME NOW the plaintiffs, and for their cause of action against the above-captioned defendants, allege and state as follows:

### Introduction

1.      It is no secret that the mortgage lending and servicing industry has been rife with practices and policies over the years that can threaten the financial goals as well as the sense of well-being of many forced to seek out its aid in hopes of securing the pride of ownership and stability that comes with purchasing a

**EXHIBIT**

*A*

home.  The housing crisis of 2008—still sharply etched into the collective memory of our nation more than a decade later—is a testament to that fact.  As this case demonstrates, some of the practices that brought about that crises exist yet today.

## PARTIES

2.      The plaintiffs, husband and wife, are both residents of Ulysses, Grant County, Kansas.  They are domiciled in the state of Kansas for jurisdiction purposes.

3.      Defendant PHH Mortgage Corporation ("PHH") is a New Jersey domestic for profit corporation which has been authorized to transact business in the state of Kansas.  It may be served with process by service on its registered agent, Corporation Service Company, 2900 SW Wanamaker Drive, Suite 204, Topeka, KS 66614.

4.      Defendant Ocwen Loan Servicing, LLC ("Ocwen") is a Delaware limited liability company that is not authorized to transact business in the state of Kansas.   It may be served with process by service on its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. None of the members of this limited liability company are domiciled in this state.

5.      Defendant Bank of New York Mellon Trust Company, National Association ("BNY Mellon") is a California business entity that is not authorized to transact business in the state of Kansas.  It may be served with process by service at its principal place of business at 400 South Hope Street, Suite 400, Los Angeles, CA 90071.

6.     Defendant Indecomm Holdings, Inc. d/b/a Indecomm Global Services ("Indecomm") is a Delaware corporation authorized to transact business in the state of Kansas.  It may be served with process by service upon its resident agent at 112 S.W. 7th Street, Suite 3C, Topeka, KS 66603.  Indecomm's principal place of business is in New Jersey.

## JURISDICTION

7.     This action involves a dispute between citizens and corporations of different states, and the amount in controversy is in excess of $75,000. Accordingly, this Court's diversity jurisdiction is invoked under 28 U.S.C. § 1332.

8.     Jurisdiction is also proper under federal question jurisdiction (28 U.S.C. § 1331) due to the plaintiffs' claims brought under RESPA (12 U.S.C.A. § 2605).

9.     Jurisdiction over the plaintiffs' state law claims is further proper pursuant to this Court's supplemental jurisdiction under 28 U.S.C.A. § 1367, as the plaintiffs' state law claims are so related to those claims already within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10.     Venue is proper with this Court pursuant to 28 U.S.C.A. § 1391(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district, and the property that is the subject of this action is situated entirely within this district.

3

## STATEMENT OF FACTS

11.     On February 25, 2000, the Morals executed a mortgage agreement ("the mortgage") to Aames Funding Corporation, a California Corporation, DBA Aames Home Loan.  The mortgage was recorded with the Grant County Register of Deeds Office on February 28, 2000 in Book 202 at pages 231–42, securing the original sum of $132,750.00.

12.     The funds secured through the mortgage agreement were applied to the purchase price of the Morals' home, located at 816 North Joyce, Ulysses, KS 67880.

13.     On January 22, 2002, an assignment of the mortgage was recorded in Book 212 at pages 293–95 with the Grant County Register of Deeds Office that was allegedly executed by Aames Funding Corporation on December 26, 2001 in favor of "Aames Capital Corporation."   The document states that it was signed by Josephine Naces, "Assistant Secretary" of Aames Funding Corporation, DBA Aames Home Loan.

14.     On January 27, 2003, an assignment of the mortgage from Aames Capital Corporation to "Bank One National Association, as Trustee" was recorded with the Grant County Register of Deeds Office in Book 218 at pages 125–27, even though the same document purports to have been executed three years prior on February 29, 2000 by "Amy Brackett"—allegedly the Secretary of Aames Capital Corporation—meaning it would have preceded the execution of the assignment to Aames Capital Corporation from Aames Funding Corporation by nearly two years.

4

15. Bank One subsequently merged with JPMorgan Chase & Co. in July of 2004, and later events indicate that the note securing the mortgage was placed in the possession of the banking entity born from that merger, JPMorgan Chase Bank N.A.

16. Yet another assignment of the mortgage was recorded on June 16, 2008 in the Grant County Register of Deeds Office in Book 249 at pages 227–29, this time from Bank One National Association, as Trustee, c/o HomeComings Financial, LLC (TX) to "The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A. as Trustee, c/o HomeComings Financial, LLC (TX)" and allegedly executed by a Frank Ruhl as "Vice President" of Bank One National Association on June 3, 2008.

17. Another assignment of the mortgage was recorded in the Grant County Register of Deeds Office on June 15, 2009 at Book 254, pages 425–26. This assignment purports to have assigned the mortgage from The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A., as Trustee, c/o RESCAP (GMAC) DBA HomeComings Financial, LLC (TX) to "The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A. as Trustee for RAMP 2006SP3, c/o RESCAP (GMAC) DBA HomeComings Financial, LLC (TX)." This document purports to have been executed on June 4, 2009 by, once again, Frank Ruhl, this time as "Vice President" of The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A. as Trustee.

5

## Ocwen's History as Mortgage Servicer

18.    Based upon information and belief, HomeComings Financial, LLC was founded by General Motors Acceptance Corporation ("GMAC"), and became a subsidiary to GMAC's Residential Capital Corporation ("RESCAP"), itself an entity created specifically by GMAC as a place to stow all of its problematic divisions linked to the servicing of residential mortgages. HomeComings Financial, LLC was the entity to which the Morals initially began submitting payments on their mortgage until RESCAP assumed the servicing of the mortgage itself, but in HomeComings Financial, LLC's name.   HomeComings Financial, LLC and RESCAP d/b/a HomeComings Financial, LLC eventually experienced serious financial difficulties as a result of their exposure to the subprime lending mortgage crisis of 2008, and underwent liquidation in December of 2013 as part of the terms of bankruptcy filings.

19.    Since RESCAP's and HomeComings Financial, LLC's liquidation, Defendant Ocwen began servicing the mortgage.

20.    A servicer who does not originate a mortgage loan may become the servicer by purchasing the "mortgage servicing rights" or by entering into a contract with the "master servicer" to act on its behalf as "subservicer."   Such transfers can occur at various stages of repayment of the mortgage, including where the borrower is delinquent in payments and may seek loss mitigation assistance from the servicer to avoid foreclosure on the loan.   Borrowers do not

choose their mortgage servicer and have no control over whether and how their loans are serviced.

21.     Between 2010 and the first quarter of 2014, Ocwen's residential servicing portfolio grew from 351,595 loans with an aggregate unpaid principal balance of approximately $465 billion.  Ocwen's largest acquisition during this time period was its 2013 purchase of Residential Capital, LLC's ("Residential Capital") servicing platform and it mortgage servicing rights to 1,740,000 loans with an aggregate unpaid principal balance of approximately $183.1 billion.  As of December 31, 2016, Ocwen serviced approximately 1,393,766 loans with an aggregate unpaid principal balance of approximately $209 billion.  Its loans are located in all fifty states and the District of Columbia.

22.     Fundamental functions of a mortgage servicer include processing and applying borrower payments, communicating accurate payment information to borrowers, managing escrow accounts, and maintaining accurate loan balance information.

23.     Servicers also respond to borrower inquiries, handle loss mitigation requests, and initiate foreclosure proceedings, among other functions.

24.     To perform these tasks, servicers input loan and borrower information into electronic databases, often referred to as systems of record. Systems of record are essential to a servicer's ability to service loans in accordance with applicable legal requirements.  If the information the servicer inputs into the system of record is inaccurate, or the system itself has deficiencies that produce

inaccurate information even when the servicer inputs correct information, a servicer can make critical errors that harm borrowers.

25.     Until 2019, Ocwen utilized a proprietary system of record, REALServicing, and is related sub-systems (collectively "REALServicing").

26.     The REALServicing proprietary system of record has been the subject of a number of Consumer Protection lawsuits due to noted system architecture and design flaws resulting in improperly managed data, lack of automation, and lack of capacity.  These flaws compounded in such a manner that adversely impacted the accuracy of information that Ocwen used to service loans—and thus, Ocwen's ability to service loans—in a number of ways.

27.     These deficiencies and flaws within the REALServicing proprietary system utilized by Ocwen resulted in Ocwen's inability to (i) accurately identify the lenders in possession of notes secured by borrowers' mortgages being serviced by Ocwen, (ii) accurately identify assignments of the underlying mortgages, (iii) provide accurate information to borrowers submitting information requests regarding such errors, and (iv) timely correct such errors.  The REALServicing proprietary system further resulted in Ocwen failing to timely credit and apply borrower payments, and provide accurate information thereof to borrowers upon request.

28.     These deficiencies within Ocwen's REALServicing propriety system further resulted in inaccurate information on borrower's loans being transmitted to its subservicers.

## Plaintiffs Raise Concerns

29.     From 2015 to 2017, the Morals raised questions regarding the accuracy of the various assignments of record pertaining to their mortgage and Ocwen's claimed legal authority to act as servicer thereof.

30.     However, Ocwen's internal notes only received by the Morals on December 13, 2021 shows that Ocwen's personnel were distinctly aware in 2017 that there were problems with the assignments of record for the Morals' mortgage.

31.     These internal documents reveal an entry made by Ocwen personnel on February 8, 2017, that "Wells Fargo" was in physical possession of the original note secured by the Morals' mortgage.

32.     On March 1, 2017, an entry was made within Ocwen's internal documents regarding the servicing of the Morals' mortgage that stated "[t]his is a cloudy title issue. Please forward the concerned department and verify the same.. Complete incorrect research and response."

33.     These internal documents further contain an entry made on May 11, 2017, stating "ASSIGNMENT MISSING – REQUEST TO CONTRACT MANGMT."

34.     Despite the noted appearance of problems regarding the accuracy of information surrounding the Morals' mortgage made by Ocwen personnel within their own internal notes, Ocwen had its Kansas City attorney, Jonathan D. Nicol of Bryan Cave LLP, mail the Morals a letter on May 12, 2017 providing seemingly-learned assurances that the Morals' complaints regarding the legitimacy and accuracy of the assignments underlying their mortgage were "without merit." The

Morals—without access to the resources or internal documentation of Ocwen showing steps taken by Ocwen personnel to cover up the deficiencies in their record keeping—had no reason to dispute Nicol's analysis prepared for the purpose of persuading them to take no further action or investigate further.

35.     On May 16, 2017, Ocwen's internal documents show that an "[e]xecutable new assignment" was drafted and assigned for execution, apparently generated as an assignment of the Morals' mortgage from "bank one national association as trustee" to "The Bank of New York Mellon Trust Company National Association f/k/a The Bank of New York Trust Company N.A. as successor to JP Morgan Chase Ban[k]." The assignment document was purportedly executed and "sent to vendor for recording" on May 26, 2017.

36.     Subsequent entries made by Ocwen personnel express further problems in Ocwen's attempts to verify its internal information and the accuracy of entities associated with the Morals' mortgage.

### Ocwen's Acquisition of Servicing Rights

37.     In July of 2017, an agreement between Ocwen and New Residential Investment Corp. was announced regarding a transfer of mortgage servicing rights held by Ocwen for loans valued at approximately $110 billion in unpaid principal balance to New Residential Mortgage LLC ("NRM"), a wholly owned subsidiary of New Residential Investment Corp.   Pursuant to this agreement, a 5-year subservicing agreement was entered between NRM and Ocwen in which Ocwen would subservice the mortgage loans underlying the transferred mortgage

servicing rights.  Pursuant to this agreement, New Residential Investment Corp. agreed to make an equity investment of approximately $13.9 million to purchase approximately 4.9% of Ocwen's common equity.

38.    On October 4, 2018, Ocwen announced its complete acquisition of PHH, whereby PHH became a wholly-owned subsidiary of Ocwen.  The intent of Ocwen's acquisition of PHH was to make PHH the subservicer of the loans serviced by Ocwen, including the loans Ocwen subserviced on behalf of NRM.

39.    PHH has represented in these proceedings that it did not merge with Ocwen until June 1, 2019, and that PHH assumed servicing of the Morals' loan on that date.  (Doc. 11, ¶ 23)

40.    Ocwen announced on June 10, 2019 that it has completed the final phase of its loan transfer process and transition from the REALServicing proprietary system to the "Black Knight LoanSphere® MSP Platform ("MSP")," in which Ocwen transferred "approximately one million loans to the MSP platform" following "a significant amount of preparation, training, rigorous pre-boarding testing and customer communications."  Ocwen's June 10, 2019 announcement stated that, "[i]n addition to the loan transfers and system conversion to MSP, Ocwen completed the merger of its licensed legal entity, Ocwen Loan Servicing, into PHH Mortgage Corporation."

## Plaintiffs' Attempts to Pay Off Mortgage

41.    The Morals struggled financially for a number of years in paying off their mortgage while the mortgage and documents associated therewith were repeatedly exchanged between various servicers and lenders since the mortgage first came into creation nearly two decades ago, and had been threatened with foreclosure.

42.    However, in November of 2020, the Morals believed their luck had changed when a substantial inheritance finally placed them in a position to fully pay off the substantial sums still owing on their mortgage in full, which they made their first priority.

43.    When notifying PHH of their intent to pay off the loan in full, they immediately encountered problems with PHH's payoff procedure, both in their ability to receive accurate and timely payoff statements, as well as the manner in which PHH credited those payments on the Morals' account statements.

44.    The Morals initially requested a payoff quote for the mortgage on November 11, 2020.

45.    PHH's internal documents show that the requested payoff quote was not approved for sending until November 16, 2020, with such payoff quote reflecting that the total amount due on the loan as of November 12, 2020 was $68,206.31, with such payoff quote having a valid through date of November 22, 2020.

46.     On November 17, 2020, after having received no prior instructions or information on when he could expect to receive the payoff quote requested on November 11, 2020, or whether the requested method of payment would differ in kind from that previously accepted by PHH/Ocwen, Carlos Moral decided to simply begin submitting payments online, paying the maximum daily-figure inexplicably allotted by PHH for such payments of $25,000 a day.

47.     On November 17, 2020, Carlos Moral paid $25,000 to PHH.

48.     On November 18, 2020, Carlos Moral paid $5,000 to PHH.

49.     On November 19, 2020, Carlos Moral paid $24,999.90 to PHH.

50.     On November 23, 2020, Carlos Moral attempted submitted two separate payments of $8,550.90 and $6,050.90 to PHH, totaling $14,601.80, but PHH only accepted payment of the payment in the amount of $8,550.90.

51.     PHH temporarily froze the Morals' ability to make further online payments.

52.     From November 17, 2020 to November 23, 2020, the Morals had already paid $63,550.80 to PHH on their mortgage loan through submitting payments online, just $4,655.51 short of the November 12, 2020 payoff quote.

53.     Despite there being no issues for PHH in its receipt and crediting of other payments on their mortgage through PHH's online portal—outside of the online payment of $6,050.90 it chose to reject—PHH personnel insisted that the Morals could only submit a full final payoff through the use of certified funds. This was a self-imposed policy previously uncommunicated to the Morals, and PHH

13

was not actually prevented pursuant to law or other regulations related to mortgage servicers from simply accepting the submitted payment of $6,050.90, utilizing an alternative accepted means to verify its accuracy, and subsequently refunding any overpayment.

54.    Despite having immediately requested another payoff quote, the Morals did not receive another quote for the remainder of November of 2020.

55.    While there was a net positive in funds contained in the escrow account for the mortgage in the amount of $276.92 as of the end of November of 2020, property taxes on the home applied on December 1, 2020 in the amount of $1,814.32 reduced such escrow balance to a net negative of $1,537.40.

56.    After not receiving a payoff quote again as of December 3, 2020 (as the December 1, 2020 payoff quote generated by PHH was noted as incorrect), Carlos Moral spoke with a PHH customer service representative and requested to pay off the apparent $895.97 remaining on the unpaid principal balance of his mortgage as represented on his monthly statement created on December 1, 2021, and was told to go ahead and proceed.

57.    When Carlos Moral submitted $895.97 on December 4, 2020, instead of being applied to the unpaid principal balance upon submission, this was placed in a suspense account instead, with the reason cited within the servicing notes being that the funds were insufficient to pay off the mortgage.

58.    Several payoff quotes for the Morals' mortgage were generated in early December by PHH.  One such payoff quote, created on December 9, 2020,

14

stated the total amount owing on the mortgage was $6,197.75, with a valid through date of December 15, 2020.  Another was drafted on December 14, 2020 that subtracted the previously paid amount of $895.97 to reflect a total amount owing on the mortgage as $5,301.78, with a valid through date of December 15, 2020. The latter payoff quote is noted within PHH's internal documents as having been faxed directly to the Morals on the 14th, who received it the same day.  Yet another payoff quote was purportedly drafted on the exact same day, December 14, 2021, this time reflecting the amount owing on the mortgage as $5,302.72 with a valid through date of December 24, 2020.

59.    After PHH indicated it would accept final payments over the phone, Carlos Moral submitted separate payments in the amount of $1,000 on December 28, 2020, and $4,303.32 on December 29, 2020.

60.    Another payoff quote was generated by PHH on December 30, 2020, reflecting the total amount still owing on the mortgage was $5,413.67 with a valid through date of January 9, 2021.

61.    After the Morals submitted payments at the end of December, Carlos Moral complained on January 4, 2021 that the paid amounts had not yet been applied by PHH.  Following this complaint, PHH's internal documents show the manner it allegedly applied funds held in suspense to zero out the remaining amounts appearing on the Morals' statements, which resulted in no refund to the Morals.

62.   The Morals paid a total of $69,750.09 to PHH from November 17, 2020 to December 29, 2020.

## Invalid Releases of Plaintiffs' Mortgage

63.   After the Morals' mortgage had been paid in full, PHH had the duty to file a release of the Morals' mortgage with the Grant County Register of Deeds Office.

64.   After seeing no release had been filed as of late January 2021, and eager to ensure their obligations were fully satisfied and no further issues with their mortgage and title would occur, Carlos Moral began making a series of phone calls to PHH asking for information on the release of their mortgage.

65.   On or about January 19, 2021, Carlos Moral convinced a PHH employee he believes went by the name "Tom" to email him a copy of the release created for his mortgage, which he intended to take to the Grant County Register of Deeds Office to record himself.

66.   The release Carlos Moral received was purportedly executed on January 19, 2021 in Ramsey County, Minnesota, and signed by a "Lisa Spurbeck" as "Vice President" of "Bank One, National Association F/K/A The First National Bank of Chicago as Trustee by PHH Mortgage Corporation Successor by Merger to Ocwen Loan Servicing, LLC Successor in Interest to Ocwen Federal Bank FSB Its Attorney in Fact."

67.   Notably, "Lisa Spurbeck"—who according to the Notary Registry for the State of Minnesota was a notary herself prior to her commission expiring on

16

January 31, 2018—had previously been labeled as a "suspect actor" as part of a comprehensive forensic examination conducted by DK Consultants LLC commissioned by the Clerk of the Circuit Court of Osceola County, Florida of the real property records of Osceola County, Florida in 2014 as part of an investigation into violations of civil and criminal statutes "by virtue of their submission for recordation or filing." More specifically, the examination stated that mortgage documents prepared by a "Lisa Spurbeck" on behalf of the company "Indecomm Global Services" evidenced a "lack of actual, personal knowledge of the signors" behind these filings. This practice is referred to in the mortgage servicing industry as "robo-signing."

68.    Carlos Moral subsequently took this "release" purported to have been signed by Lisa Spurbeck as "Vice President" of Bank One, National Association (which had already long-been merged out of existence at that point in time) to the Grant County Register of Deeds for filing. Carlos was shocked when he was informed by the Register of Deeds that she had actually already received the exact same document prior, and had rejected it due to its clear inconsistencies with the purported assignments on file. According to the filings of record, BNY Mellon was the holder of the note and was thus the entity that would be required to file the release.

69.    Ocwen/PHH's own personnel knew as far back as 2017 of the issues in their record keeping compared to the assignments of record, and that there was a cloud on the title to the Morals' title resulting from such deficient records.

70.     PHH's internal documents show that Carlos Moral called PHH on February 1, 2021 to provide notice of the defective release and the fact that it did not reflect the assignments of record, and was assured that this would be looked into and resolved.

71.     PHH's internal documents further state that Carlos Moral again called PHH on February 8, 2021 asking about the status of the Morals' mortgage release, and was told that PHH had "corrected the lien release doc," and a copy would eventually be emailed to him.   Carlos, however, specifically remembers the representative he discussed the issue with telling him that PHH was not going to change the lien release and to stop calling them.

72.     The Morals had previously reached out to Trish O'Neal of the Kansas Office of the State Bank Commissioner for assistance on the issue of their release on February 5, 2021, and O'Neal sent correspondence to PHH requesting clarification on the issue.

73.     In its return correspondence dated February 22, 2021, PHH represented that:

> [T]he Morals state the lien should be released from Bank of New York Mellon Trust Company, National Association as the last holder of the note.  We requested the lien release department to review and advise if the satisfaction of mortgage that was sent to the county indicated accurate information. As per our records, there is no recorded assignment from Bank One to Bank of New York (BONY). Accordingly, our vendor executed the release from Bank One and sent it for recording on January 22, 2021.

74. The Morals' anxieties over the circumstances surrounding the release of their mortgage compelled Carlos Moral to call Bank of New York Mellon directly to enquire about the status of their mortgage. After several phone calls, Carlos finally managed to reach a representative who could pull the records related to their mortgage. The Morals were informed that BNY Mellon's records still showed the Morals owed over $115,000.00 on their mortgage, and that BNY Mellon had not received payments related to the mortgage for some time. When asked why foreclosure proceedings had not been initiated, the Morals were simply told that it must have "fallen through the cracks," and that the Morals were likely the victims of fraud.

75. The Morals, in a panic, began contacting multiple parties to try and see what could be done to sort out this problem, including the Register of Deeds for Grant County, Frazee Abstract & Title Inc.—a Title service company in Ulysses—to gain an independent expert opinion, and Kansas Banking Commissioner Trish O'Neal once more, who indicated an investigation of the matter was warranted.

76. The title opinion generated by Frazee Abstract & Title Inc. confirmed to the Morals that the release provided by PHH was defective.

77. However, the plot thickened in a most unusual manner when, on March 1, 2021, a very large stack of "releases" was filed all at once by—upon information and belief—an unknown party who claimed he had just driven all the

way from Denver, Colorado to the Grant County Register of Deeds Office in Kansas purely for the purpose of filing the stack of releases "immediately."

78.    The filed document was allegedly executed on February 25, 2021 by a "Chris Johnson" as "Vice President" of "The Bank of New York Mellon Trust Company, National Association f.k.a. The Bank of New York Trust Company, N.A. as Successor to JPMorgan Chase Bank, N.A. as Trustee for Residential Asset Mortgage Products, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2006-SP3 by Its Attorney in Fact Ocwen Loan Servicing, LLC."

79.    One noticeably strange aspect of the document is that, just like the previous defective release, it purports to have been executed by Chris Johnson in "Ramsey County, Minnesota," even though BNY Mellon has no corporate offices whatsoever in Minnesota.

80.    Carlos Moral, attempting to look into the existence of the "Chris Johnson" whose name appears on the filed mortgage release, found one such officer of BNY Mellon bearing the name who was located in the corporate offices of BNY Mellon's office in Los Angeles, California.

81.    This "Chris Johnson" was questioned by Carlos Moral on the apparent use of his signature on the "release" purportedly executed in Ramsey County, Minnesota.   "Chris Johnson" confirmed that he had never signed any such document on the date in question, nor did he have any reason to be in Ramsey County, Minnesota at all.  It was believed that Chris Johnson's signature must have been forged, which has not yet been confirmed.

82.     After this new release was filed with the Grant County Register of Deeds, PHH mailed follow-up correspondence to O'Neal of the Kansas Office of the State Bank Commissioner to express the issue with the release for the Morals' mortgage had been resolved.  Attached to this letter were documents apparently submitted to O'Neal for the purpose of proving they got it right this time around.

83.     One of the documents PHH sent to O'Neal, oddly enough, was an "Assignment of Mortgage/Deed of Trust" purportedly executed by "Mark Jordan" as "Assistant Vice President of Bank One National Association as Trustee, Residential Funding Corporation as Attorney in Fact."  The document oddly has a blank spot where the "Assignee" of this assignment should be, and nevertheless, purports to have been executed on April 19, 2006 and even notarized by an "Adele M. Dolan," a notary public supposedly located in Minnesota.

84.     Following the filing of the instant lawsuit, new explanations were provided to the Morals for the first time regarding the allegedly true identity of the "Chris Johnson" whose signature appears on their mortgage release filed on March 1, 2021.

85.     It has been the position of the defendants that "Chris Johnson" is actually an employee of a vendor for Ocwen, "Indecomm Global Services."

86.     In fact, both Lisa Spurbeck and Chris Johnson have been represented to be employees of Indecomm.

87.     The Morals were wholly unaware at all relevant times that BNY Mellon/Ocwen/PHH would utilize Indecomm to execute documents pertaining to

their mortgage and property—i.e. the preparation, notarization, delivery, and recording of the release of their mortgage.

88.   No disclosure of Indecomm's affiliation with the other defendants was provided, and the Morals were not provided an option in their provider of settlement services related to the execution and recordation of release of the loan.

89.   As evidenced by the noted problems with the January 19, 2021 release executed by Lisa Spurbeck which contained verifiably false information concerning the assignments of record pertaining to the Morals' mortgage—which Ocwen knew or should have known based upon its own notes in servicing the Morals' mortgage—Indecomm's employees engage in the practice of robo-signing on behalf of mortgage lenders and servicers by executing critical documents affecting the real estate of consumers nationwide without verifying the accuracy of the information contained within such documents.  Indecomm further engages in the practice of misrepresenting the status of its employees as the corporate officers of the entities it is hired by to perform such services to give such documents greater credibility to an unwitting potential title examiner.

90.   Despite Ocwen's apparent affiliation with New Residential Mortgage LLC and PHH, BNY Mellon has not produced any instruments purporting to directly provide Ocwen with power of attorney over the mortgages owned by BNY Mellon.

## CLAIMS FOR RELIEF

### COUNT 1:
### Violations of RESPA

91.     Plaintiffs reallege and incorporate the allegations set forth in the above paragraphs by reference.

92.     The above allegations demonstrate that defendants PHH and Ocwen have violated statutory and regulatory duties owed as servicers of the Morals' mortgage under the Real Estate Settlement Procedures Act ("RESPA") in a manner that has harmed the pecuniary interests of the plaintiffs.

93.     More specifically, these defendants have failed to take timely action in responding to the plaintiffs' requests to correct errors relating to the allocation of payments, final balances for purposes of paying off the mortgage, and other standard servicer duties.

94.     These defendants also failed to provide the Morals timely and appropriate notices regarding the transfers upon the servicing of their mortgage, and have not demonstrated they are exempt from such notice requirements.

95.     Defendant Indecomm has violated RESPA's prohibitions against kickbacks and unearned fees under 12 U.S.C. § 2607 and associated regulations by accepting fees and other things of value from defendants Ocwen and/or PHH for performing business incident to or a part of a real estate settlement service involving a federally related mortgage loan that the Morals were required to use.

96.     Further violations of the requirements of RESPA and its regulatory scheme include: (1) failing to provide accurate and timely disclosures to the Morals regarding the servicing of their mortgage; (2) failing to investigate, respond to, and make appropriate corrections in response to complaints asserted by the Morals; (3) failing to provide the Morals with accurate and timely information and documents in response to the Morals' requests for information; (4) failing to provide the Morals with accurate and current information and documents of the mortgage loans they own; (5) failing to provide their own personnel with access to accurate and current documents; (6) failing to accept payment that conforms to the servicer's written requirements for borrowers to follow in making payments; (7) failing to apply an accepted payment to the principal, interest, escrow, or other charges under the terms of the mortgage loan and applicable law; (8) failure to provide an accurate payoff balance upon the Morals' request; (9) generally taking other actions in error related to the servicing of the Morals' mortgage loan; and (10) failing to conduct a reasonable investigation of the errors complained of and other errors that should have been readily apparent, and failing to then correct those errors.

97.     The above-alleged violations of RESPA have resulted in actual damages to the Morals in the form of: (1) Lost time spent in investigation of the defendants' failure to comply with their statutory duties; (2) costs of retaining counsel to aid in the Morals' investigation of the matter and other litigation expenses; (3) severe mental anguish affecting the health and well-being of the

Morals induced by associated stress; (4) the loss in marketability of their home due to the cloud placed on their title due to the ineffective releases; and (5) other related damages resulting directly from the defendants' violation of their statutory duties.

## COUNT 2:
## Violations of the Dodd-Frank Wall Street
### Reform and Consumer Protection Act

98.    Plaintiffs reallege and incorporate the allegations set forth in the above paragraphs by reference.

99.    Pursuant to 12 U.S.C. § 1639g, "[a] creditor or servicer of a home loan shall send an accurate payoff balance within a reasonable time, but in no case more than 7 business days, after the receipt of a written request for such balance from or on behalf of the borrower."

100.    The various payoff quotes provided to the Morals by PHH throughout November and December of 2020, discussed above, were riddled with inaccurate and misleading information, including duplicative payoff quotes representing the same valid through date with different figures provided for the remaining amounts purportedly owed by the Morals.

101.    The failure of PHH to provide accurate and timely payoff balances resulted in damages to the Morals due to the confusing nature in which they were drafted and provided, resulting in a delay of the Morals' payoff of their loan and excessive payments being made.

**COUNT 3:**
**Violations of the Kansas Consumer Protection Act ("KCPA")**

102.   Plaintiffs reallege and incorporate the allegations set forth in the above paragraphs by reference.

103.   The performance of services relating to the servicing of the plaintiffs' mortgage by the defendants constitutes a "consumer transaction" as that term is defined by K.S.A. 50-624(c) of the KCPA.

104.   Each defendant named herein is a "supplier" in connection to a consumer transaction as that term is defined under K.S.A. 50-624(l) of the KCPA.

105.   The KCPA declares it unlawful for any supplier to engage in any deceptive act or practice in connection with a consumer transaction. *See* K.S.A. 50-626.

106.   The KCPA further declares it unlawful for any supplier to engage in any unconscionable act or practice in connection with a consumer transaction, whether it occurs "before, during or after the transaction." *See* K.S.A. 50-627.

107.   The loan servicing conduct of PHH, Ocwen, and Indecomm, as described above, constitute deceptive acts or practices in violation of Kansas law.

108.   PHH and Ocwen have willfully relied upon written representations and falsehoods as to material facts regarding the existence of underlying issues clouding the title of the Morals' home, as described above, and have made further misrepresentations to plaintiffs and the Kansas Office of the State Bank Commissioner for the purpose of concealing such problems.

109.   Indecomm has committed unconscionable acts or practices through utilizing a business model resulting in the fraudulent execution of numerous important real estate documents by its employees for submitting the same within the real property records linked to homeowner's mortgages.  Defendants PHH and Ocwen have directly encouraged and profited tremendously from Indecomm's scheme.

110.   Indecomm's business model inevitably encourages its employees to engage in robo-signing, described above.   In the present case, the release documents related to the Morals' mortgage generated by Indecomm resulted from such robo-signing, and the deficiency of such documents is compounded by the fact that Indecomm's employees falsely represent themselves as officers of the entities who facially have authority to execute such documents on behalf of lenders and servicers.

111.   The plaintiffs have suffered actual damages as a result of the defendants' deceptive and unconscionable acts and practices in the form of a cloud upon their title, expenses made in investigating and attempting to correct this unlawful conduct by defendants, and other damages.

112.   The defendants are further liable for the payment of civil penalties of not more than $10,000 for each violation ultimately established.  K.S.A. 50-636(a).

## COUNT 4:
## Fraud & Fraud by Silence

113.    Plaintiffs reallege and incorporate the allegations set forth in the above paragraphs by reference.

114.    Upon receiving notice of the plaintiffs' concerns raised in regards to the accuracy and legitimacy of the assignments of record pertaining to their mortgage and the authority provided by such documents, Ocwen, through its agent, represented in correspondence to the plaintiffs on May 12, 2017 that any such concern was "without merit."

115.    This was a false representation of material fact of which Ocwen had actual knowledge of in light of its internal documents received by plaintiffs on December 13, 2021 showing that Ocwen personnel were taking affirmative steps to discern such problems with the assignments of record and quietly cover them up both immediately before and after its agent represented there were no concerns to be had.

116.    Ocwen's internal documents expressly indicated it was investigating a "cloudy title issue" as of March 1, 2017, and noted there was an "assignment missing" on May 11, 2017, just a day before its agent sent his letter to the Morals stating there were no such problems.

117.    Ocwen's internal documents further show that it took affirmative steps to create and execute an assignment purporting to transfer the Morals' mortgage to BNY Mellon on May 26, 2017.

118. Ocwen was under an obligation to communicate both the issues it saw with the assignments of record, and could not be innocently silent as its agent provided false statements to the Morals regarding such deficiencies.

119. The Morals justifiably relied upon both the affirmative representations made in Ocwen's agent's legal analysis reputing the existence of a potential problem with the assignments of record pertaining to the plaintiffs' mortgage, and upon Ocwen as a servicer of their loan subject to statutory and regulatory duties to provide accurate information to the plaintiffs regarding their right to service the plaintiffs' mortgage.

120. Alternatively, Ocwen's silence regarding its internal acknowledgement of the deficiencies within its record keeping prevented the plaintiffs from uncovering the full extent of the misinformation Ocwen, and subsequently, PHH would ultimately be providing to its subservicers, vendors, and transferees of the mortgage servicing rights for the plaintiffs' mortgage, which resulted in such misinformation being passed off to its vendor, Indecomm, resulting in the creation of defective releases for the plaintiffs' mortgage.

121. The acts of defendant Ocwen constitute a wanton and reckless disregard of the plaintiffs' rights, which subjects it to a claim for punitive damages.

## COUNT 5:
## Slander of Title

122. Plaintiffs reallege and incorporate the allegations in the above paragraphs by reference.

123. In filing demonstrably falsified and thus invalid releases of the plaintiffs' mortgage with the Grant County Register of Deeds Office, the servicer defendants permitted to be publicized a false written statement that foreseeably impaired the value of the property in the estimation of others due to the cloud upon their title the falsified releases create.

124. Each of the above-captioned defendants have acted in some capacity as either servicers or holders of the note securing the Morals' mortgage, and whether it be through their intentional actions or gross negligence, each of the defendants shoulder varied amounts of responsibility for the circumstances that have acted to impair the value of the Morals' property in this matter.

125. As a result of the defendants' slander of title as to the Morals' property, the Morals have suffered damages in the form of lost opportunity in the resale of their home, severe mental anguish, and the cost of legal expenses that have become necessary in order to clear the cloud upon their title.

126. The acts of the defendants constitute a wanton and reckless disregard of the plaintiffs' rights, which subjects those defendants to a claim for punitive damages.

WHEREFORE the plaintiffs respectfully pray for a judgment in excess of $75,000, plus their costs and attorneys' fees, and any other and further relief this Court would deem just or equitable.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER, LC

/s/_____
Randall K. Rathbun #09765
Dylan P. Wheeler #28661
8301 E. 21st Street N., Suite 450
Wichita, KS 67206-2936
Telephone: (316) 262-4000
Fax: (316) 265-3819
Email(s): randy@depewgillin.com
dylan@depewgillen.com
*Attorneys for Plaintiffs*

## DESIGNATION OF PLACE OF TRIAL

COME NOW the plaintiffs and designate Wichita, Kansas, as the place of the trial of this action.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER LC

s/_____
Randall K. Rathbun #09765
*Attorneys for Plaintiff*

## REQUEST FOR JURY TRIAL

COME NOW the plaintiffs and respectfully request a trial by jury with regard to the above-captioned action.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER, LC

/s/
Randall K. Rathbun #09765
*Attorneys for Plaintiffs*

32