EXHIBIT   A

Randall K. Rathbun #09765
Dylan P. Wheeler #28661
8301 E. 21st Street N., Suite 450
Wichita, Kansas 67206-2936
Telephone: (316) 262-4000
Email: randy@depewgillen.com
dylan@depewgillen.com


IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| CARLOS E. MORAL and | ) | |
| JULIE K. MORAL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 6:21-cv-01070-HLT-TJJ |
| | ) | |
| PHH MORTGAGE CORPORATION | ) | |
| individually and as successor-in-interest | ) | |
| to OCWEN LOAN SERVICING, LLC; | ) | |
| BANK OF NEW YORK MELLON | ) | |
| TRUST COMPANY, NATIONAL | ) | |
| ASSOCIATION, as trustee for RAAC | ) | |
| SERIES 2006-SP3 TRUST; and | ) | |
| INDECOMM HOLDINGS, INC. | ) | |
| d/b/a INDECOMM GLOBAL SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT**

COME NOW the plaintiffs, Carlos and Julie Moral, and for their causes of action

against the above-captioned defendants, allege and state as follows:

*Introduction*

1.      It is no secret that the mortgage lending and servicing industry has been rife

with practices and policies over the years that can threaten the financial goals as well as

the sense of well-being of many forced to seek out its aid in hopes of securing the pride of

ownership and stability that comes with purchasing a home.  The housing crisis of 2008—

still sharply etched into the collective memory of our nation more than a decade later—is a testament to that fact.  As this case demonstrates, some of the practices that brought about that crisis exist yet today.

## PARTIES

2.      The plaintiffs, husband and wife, are both residents of Ulysses, Grant County, Kansas.  They are domiciled in the state of Kansas for jurisdiction purposes.

3.      Defendant PHH Mortgage Corporation ("PHH") is a corporation incorporated under the laws of the State of New Jersey, and maintains its principal place of business in the State of New Jersey.  PHH is authorized to transact business in the state of Kansas, and may be served with process by service on its registered agent, Corporation Service Company, 2900 SW Wanamaker Drive, Suite 204, Topeka, KS 66614.

4.      Defendant Ocwen Loan Servicing, LLC ("Ocwen") was a Delaware limited liability company that fully merged with and was succeeded by Defendant PHH on June 1, 2019.

5.      Defendant Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank, N.A., as Trustee for RAAC Series 2006-SP3 Trust (BNYM) is a company organized under the laws of the United States.  It may be served with process by service at its principal place of business at 400 South Hope Street, Suite 400, Los Angeles, CA 90071.

6.      Defendant Indecomm Holdings, Inc. d/b/a Indecomm Global Services ("Indecomm") is a Delaware corporation authorized to transact business in the state of Kansas.  It may be served with process by service upon its resident agent at 112 S.W. 7th Street, Suite 3C, Topeka, KS 66603.  Indecomm's principal place of business is in New Jersey.

## JURISDICTION AND VENUE

7.     This action involves a dispute between citizens and corporations of different states, and the amount in controversy is in excess of $75,000.  Accordingly, this Court's diversity jurisdiction is invoked under 28 U.S.C. § 1332.

8.     Jurisdiction is also proper under federal question jurisdiction (28 U.S.C. § 1331) due to the plaintiffs' claims brought under RESPA (12 U.S.C.A. § 2605).

9.     Jurisdiction over the plaintiffs' state law claims is further proper pursuant to this Court's supplemental jurisdiction under 28 U.S.C.A. § 1367, as the plaintiffs' state law claims are so related to those claims already within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10.     Venue is proper with this Court pursuant to 28 U.S.C.A. § 1391(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district, and the property that is the subject of this action is situated entirely within this district.

## STATEMENT OF FACTS

11.     On February 25, 2000, the Morals executed a mortgage agreement ("Mortgage") and promissory note ("Note") in favor their original lender, Aames Funding Corporation, a California Corporation, DBA Aames Home Loan ("Aames Funding"), securing the original sum of $132,750.00.

12.     The funds distributed to the Morals were applied to the purchase price of the Morals' home, located at 816 North Joyce, Ulysses, KS 67880 in Grant County.

13.     The Mortgage was recorded with the Grant County Register of Deeds Office on February 28, 2000.  A certified copy of the Mortgage has been attached herein as Exhibit A.

14.     The Grant County property records show four separate assignments of the ownership interest in the lien securing the Plaintiffs' payment obligations between various banking and financial institutions.  The recorded assignments have been attached herein as Exhibit B.

15.     The Morals' Note was almost immediately transferred by Aames Funding to a number of financial institutions for the purpose of "pooling" together thousands of home loans into registered trusts that issue mortgage-backed securities to financial investors.

## Recorded Assignments of Mortgage

16.     Each of the recorded assignments of the Morals' mortgage contain a number of observable irregularities and legal defects in the manner in which they were executed and recorded under Kansas law.

### First Assignment

17.     The first assignment of record—filed on January 22, 2002—purported to effect a transfer of Aames Funding's interest in the mortgage lien to Aames Capital Corporation ("Aames Capital").

18.     The January 22, 2002 assignment was executed by "Josephine Naces" as "Assistant Secretary" of Aames Funding, DBA Aames Home Loan, making the assignment defective by application of K.S.A. 58-2318, which states "[a]ll assignments and releases of mortgages by a corporation shall be valid when executed by the president, vice-president,

4

secretary, cashier, treasurer or any other officer of such corporation so authorized by corporate resolution."

*Second Assignment*

19.     A subsequent assignment was filed on January 27, 2003, purporting to transfer interest in the mortgage lien from Aames Capital to "Bank One, National Association, as Trustee" ("Bank One").

20.     The difference between the dates the assignment purports to have been executed versus when it was actually recorded is the first notable sign that it is a fraudulent document.  The assignment states it was signed on February 29, 2000, but was not recorded until nearly three years later.  The execution of the second assignment would thus have predated the execution and recording of the first assignment to Aames Capital by nearly a year, before it even held an interest in the mortgage lien at all.

21.     Additionally, the bizarre formatting of the recorded assignment was the result of intentional doctoring to alter its contents.  Plaintiffs would not have been able to confirm the fraudulent character of the assignment until March 12, 2021, when an employee of Defendant PHH attached the original, unaltered version of this assignment to a letter submitted to the Office of the Kansas Banking Commissioner related to a written notice of error submitted on the Morals' behalf, as discussed further below.

22.     The unaltered version of this assignment—attached herein as Exhibit C— shows it was originally executed as an assignment of the interest in the mortgage lien from Aames Funding to Aames Capital on February 29, 2000.

23.     The signing corporate officer for both Aames Funding and Aames Capital in each version of the assignment is "Amy Brackett."  In the unaltered original, Brackett is described as an "Assistant Secretary" for Aames Funding.  However, in the doctored

5

version sent for recording in the Grant County property records, the word "Assistant" was whited out to give the impression Bracket held requisite corporate authority under K.S.A. 58a-2318.  The altered version also whited-out any reference to "Aames Capital" as the intended assignee of the mortgage lien and altered it further to provide that Bank One, "as trustee," was the true assignee.

24.     Amy Brackett was not a Secretary for either of these corporations when signing either version of this assignment.

*Third Assignment*

25.     A subsequent assignment of the mortgage was recorded on June 16, 2008, purporting to effect a transfer of the mortgage lien from "Bank One National Association, as Trustee, c/o HomeComings Financial, LLC (TX)" to "The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank, N.A. as Trustee c/o HomeComings Financial, LLC (TX)."

26.     The assignment is defective by virtue of K.S.A. 58a-810(e)—as amended by the Kansas Legislature in 2007—which states:

> Any property may be acquired in the name of the trust or in the name of the trustee.  Property titled in the trust may be conveyed in the trust name or in the name of the trustee of that trust, underlined provided that the trust name is clearly set forth in the conveyance.

The assignment completely omits the name of the trust(s) the assignor and assignee trustees were acting on behalf of.  Because of this, there is no means of telling from the face of the recorded instrument whether the trustees were acting on behalf of separate trusts entirely, making it seriously misleading.

27.     The signor of the June 16, 2008 assignment was "Frank G. Ruhl," signing as "Vice President" of Bank One.

28.    On information and belief, Frank G. Ruhl was actually a junior officer for a subservicer of the Morals' loan, GMAC Mortgage.

*Fourth Assignment*

29.    The fourth and final assignment of the Morals' mortgage was recorded on June 15, 2009, which purported to effect an assignment of the mortgage securing the Morals' repayment of their loan from "The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A. as Trustee, c/o RESCAP (GMAC) DBA Homecomings Financial, LLC (TX)" to "[BNYM] fka The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A. as Trustee for **RAMP 2006SP3**, c/o RESCAP (GMAC) DBA HomeComings Financial, LLC (TX)." (emphasis added).

30.    The certification to the last assignment shows that "Frank Ruhl" also executed this assignment, only this time as "Vice President" of "The Bank of New York Trust Company, N.A."

31.    This final assignment of the mortgage failed to satisfy the requirements of K.S.A. 58a-810(e) for conveyances of trust property, as the trust associated with the assignor trustee is again completely omitted, and the description of the trust associated with the assignee trustee—Defendant BNYM—does not "clearly" identify the trust BNYM was trustee for.

32.    On June 10, 2009—five days before the recording of the final assignment of record purporting to effect a transfer of the mortgage security to BNYM as trustee of "RAMP 2006SP3"—a letter was mailed to the Morals from the servicer of their loan, GMAC Mortgage.  The letter from GMAC Mortgage stated "Residential Funding Corp."

was the owner of the Moral's loan.  The June 10, 2009 letter from GMAC Mortgage has been attached herein as Exhibit D.

## Ocwen's Acquisition of GMAC Mortgage

33.    A servicer who does not originate a mortgage loan may become the servicer by purchasing the "mortgage servicing rights" or by entering into a contract with the "master servicer" to act on its behalf as "subservicer."  Such transfers can occur at various stages of repayment of the mortgage, including where the borrower is delinquent in payments and may seek loss mitigation assistance from the servicer to avoid foreclosure on the loan.  Borrowers do not choose their mortgage servicer and have no control over whether and how their loans are serviced.

34.    Ocwen purchased GMAC Mortgage's loan servicing business in February of 2013 at auction after GMAC Mortgage and its various corporate affiliates, including Residential Capital, LLC ("Residential Capital") were driven to settlement with various issuers and underwriters of mortgage-backed securities asserting numerous claims related to instances of securities fraud related to these corporate entities' practices in the origination, pooling, and securitization of millions of mortgage loans.  The sale resulted in the servicing for the Morals' loan being transferred to Ocwen.

35.    Between 2010 and the first quarter of 2014, Ocwen's residential servicing portfolio grew from 351,595 loans with an aggregate unpaid principal balance of approximately $465 billion.  Ocwen's 2013 purchase of Residential Capital's servicing platform was its largest acquisition during this period of time, which resulted in the transfer of mortgage servicing rights for 1,740,000 loans with an aggregate unpaid principal balance of approximately $183.1 billion.  As of December 31, 2016, Ocwen serviced approximately 1,393,766 loans with an aggregate unpaid principal balance of

8

approximately $209 billion. Its loans are located in all fifty states and the District of Columbia.

36.     Fundamental functions of a mortgage servicer include processing and applying borrower payments, communicating accurate payment information to borrowers, managing escrow accounts, recording loan documents, and maintaining accurate loan balance information.

37.     Servicers also respond to borrower inquiries, handle loss mitigation requests, and initiate foreclosure proceedings, among other functions.

38.     To perform these tasks, servicers input loan and borrower information into electronic databases, often referred to as systems of record. Systems of record are essential to a servicer's ability to service loans in accordance with applicable legal requirements. If the information the servicer inputs into the system of record is inaccurate, or the system itself has deficiencies that produce inaccurate information even when the servicer inputs correct information, a servicer can make critical errors that harm borrowers.

39.     Until 2019, Ocwen utilized a proprietary system of record, REALServicing, and its related sub-systems (collectively "REALServicing").

40.     The REALServicing proprietary system of record has been the subject of a number of Consumer Protection lawsuits due to noted system architecture and design flaws resulting in improperly managed data, lack of automation, and lack of capacity. These flaws compounded in such a manner that adversely impacted the accuracy of information that Ocwen used to service loans—and thus, Ocwen's ability to service loans—in a number of ways.

41.     These deficiencies and flaws within the REALServicing proprietary system utilized by Ocwen resulted in Ocwen's inability to (i) accurately identify the lenders in possession of notes secured by borrowers' mortgages being serviced by Ocwen, (ii) accurately identify assignments of the underlying mortgages, (iii) provide accurate information to borrowers submitting information requests regarding such errors, and (iv) timely correct such errors.  The REALServicing proprietary system further resulted in Ocwen failing to timely credit and apply borrower payments, and provide accurate information thereof to borrowers upon request.

42.     These deficiencies within Ocwen's REALServicing propriety system further resulted in inaccurate information on borrower's loans being transmitted to its subservicers.

**Ocwen's Servicing of the Morals' Loan**

43.     Unlike the countless borrowers of subprime mortgages throughout the early to mid-2000's who became statistics to the unprecedented foreclosure rates of the subprime mortgage crisis, the Moral family managed to pass through the storm together with possession of their home intact.  However, the effort to pay off their mortgage did not come without its periods of extreme financial stress, and some clouds still loom overhead even now.

44.     By the time Defendant Ocwen acquired GMAC Mortgage's role as the servicer of their loan in 2013, Carlos and Julie Moral had two chief concerns in their lives: the repayment of their mortgage, and more importantly, raising their young teenage prodigy, Braxton Moral.

45.     Recognizing Braxton's heightened academic talent, and desiring the provide him with an education someone with his potential deserved, Carlos and Julie Moral enrolled Braxton into the Harvard extension program.

46.     While Braxton's enrollment in the program throughout his high school career provided him increased opportunities in his academic development, the financial realities facing the Morals throughout 2015-2019 made shouldering the costs of a Harvard education an incredibly heavy burden to bear.

47.     As the accumulated equity in their home from making payments on their mortgage was the most valuable asset the Morals could look to in paying for Braxton's education, they took steps to seek a home equity loan that would constitute a junior lien to their mortgage.  They first sought a title examination to ensure they would be eligible, which Charles L. Hacker of American Title of Ulysses, Inc. provided on May 8, 2015.  A copy of Hacker's Title Examination Report has been attached herein as Exhibit E.

48.     Hacker's report expressed a deep concern toward the legitimacy of the "irregular" second assignment of record for the Morals' mortgage that purported to effect a transfer of security interest in the Morals' loan from Aames Capital to Bank One, as discussed above.

49.     After receipt of this title report, the Morals submitted a complaint with the Kansas Office of the State Bank Commissioner with a copy of the report, which was forwarded on to Ocwen.

50.     On May 12, 2015, Jonathan D. Nicol of Bryan Cave LLP in Kansas City, Missouri generated a response to the Morals' complaint on behalf of Ocwen that disputed Hacker's conclusions, stating that "none of [Hacker's] reasons confirms that the

Assignment is fraudulent." A copy of Nicol's May 12, 2015 response is attached herein as Exhibit F.

51.     After continuing to have troubles in obtaining a second loan, the Morals subsequently submitted Hacker's Title Report directly to Ocwen on December 9, 2016. A copy of the email exchange comprising the Morals' request, as well as Ocwen's response, is attached herein as Exhibit G.

52.     On December 23, 2016, Stephanie Buls of Ocwen's Office of the Consumer Ombudsman responded to the Morals' request, stating in part:

> The title examination stated in [Hacker's] opinion, the assignment clouds the title and suggested the assignment is questionable due to the small technicalities. However, the formatting does not invalidate the AOM and does not suggest fraud. This office has thoroughly reviewed the AOM, as well as, confirmed the validity with the county and found no errors in execution to deem a corrected AOM must be executed.

53.     Carlos Moral responded on January 24, 2017, requesting to be provided "the current name, address and contact info on the current owner of [the Morals'] mortgage."

55.     Ocwen's internal documents in the form of "servicing comment logs" show that from January to May of 2017, the original Note was ordered from Wells Fargo Bank, N.A. (the defendants' document custodian), Ocwen's employees noted that previous research on the holder of the instrument was incorrect, and that there was an "ASSIGNMENT MISSING."

56.     On May 2, 2017, after the Morals had been waiting for months for a response from Ocwen on the information requested, Jonathan D. Nicol of Bryan Cave emailed Carlos regarding a "title issue" that Carlos desired Ocwen's assistance in correcting, and asked Carlos to send copies of all documents and correspondence known to the Morals regarding the issue.

57.     On May 3, 2017, Carlos sent an email to Nicol to thank him for getting involved, stating that Ocwen had refused to help with the confusion surrounding his title, and that he simply needed "some of the equity in [his] home to pay Harvard tuition for [his] 15 year old son who attends."

58.     On May 4, 2017, Nicol sent an email to the Morals to see if they would discuss their concerns with him, as well as to discuss a separate payment error submitted by the Morals through a second complaint the Morals submitted to Ocwen through the Consumer Financial Protection Bureau.

60.     Later, on May 12, 2017—the day after Ocwen's own internal servicing comment logs refer to a missing assignment to BNYM—Nicol mailed the Morals a response to their written request previously submitted through the Consumer Financial Protection Bureau.  Nicol's May 12, 2017 correspondence is attached herein as Exhibit H.

61.     Nicol's response largely repeated those representations made as to the legitimacy of the second assignment of the mortgage in his prior May 12, 2015 correspondence, but additionally cited the Kansas UCC in support of the claim that the note could be enforced by any "holder of the note" when endorsed "in blank."  Nicol ended the correspondence by stating "Ocwen has investigated your complaint and determined it is without merit."

62.     Following receipt of this explanation, and already caught up with the matter of their separate notice of error regarding Ocwen's credit reporting, the Morals relied on Nicol's statements asserting there was nothing requiring action on Ocwen's part as to the assignments of the mortgage, and the Morals resolved to find other means of supporting their son's educational expenses outside of borrowing against the equity in their home.

63.     Meanwhile, Ocwen's servicing comment log shows that behind the scenes—and completely unknown to the Morals at the time—Ocwen's employees were scrambling for months after-the-fact to execute further endorsements of the Morals' Note to cover up the deficiencies in their record-keeping.

64.     With the apparent inability to seek corrections to the assignments of the mortgage lien, the Morals struggled to pay for their son's education by seeking a series of loans from other sources outside of the equity in their home.

65.     By virtue of his parents' efforts to secure the funds necessary to afford his education—efforts that would have largely been unnecessary had the Morals been able to borrow against the equity in their home—Braxton simultaneously graduated from high school and Harvard University in 2019 at the age of 17.

### Ocwen's Acquisitions and Mergers

66.     In July of 2017, an agreement between Ocwen and New Residential Investment Corp. was announced regarding a transfer of mortgage servicing rights held by Ocwen for loans valued at approximately $110 billion in unpaid principal balance to New Residential Mortgage LLC ("NRM"), a wholly owned subsidiary of New Residential Investment Corp.   Pursuant to this agreement, a 5-year subservicing agreement was entered between NRM and Ocwen in which Ocwen would subservice the mortgage loans underlying the transferred mortgage servicing rights.   Pursuant to this agreement, New Residential Investment Corp. agreed to make an equity investment of approximately $13.9 million to purchase approximately 4.9% of Ocwen's common equity.

67.    On October 4, 2018, Ocwen Financial Corporation announced its complete acquisition of PHH and PHH Mortgage Corporation, a wholly owned subsidiary of PHH, whereby PHH merged with Ocwen Loan Servicing, LLC and would constitute the surviving entity and wholly-owned subsidiary of Ocwen Financial Corporation.  The intent of Ocwen's acquisition of PHH was to rebrand itself by making PHH the subservicer of the loans serviced by Ocwen, including the loans Ocwen subserviced on behalf of NRM.

### Plaintiffs' Attempts to Pay Off Mortgage

68.    After years of struggling to pay off their mortgage and being threatened with foreclosure by the defendants, the Morals believed their luck changed in November of 2020 when an inheritance finally placed them in a position to fully pay off the substantial sums still owing on their mortgage in full, which they made their first priority.

69.    When notifying PHH of their intent to pay the loan in full, they immediately encountered problems with PHH's payoff procedure, both in their ability to receive accurate and timely payoff statements, as well as the manner in which PHH credited those payments on the Morals' account statements.

70.    The Morals initially requested a payoff quote on November 11, 2020 through submitting a request on PHH's online website.

71.    PHH generated a payoff quote dated November 12, 2020 that was not received by the Morals until November 16, 2020.  The payoff quote stated the "total amount due" was $68,206.31, and had a valid through date of November 22, 2020.

15

72.     The payoff quote stated that payoff funds could be paid "by wire transfer, cashier's check, certified bank check, money order, attorney's escrow check, MoneyGram or <u>Western Union</u>."

73.     Western Union is an online payment method PHH allows borrowers of the loans it services to use for submitting payments.

74.     November 17, 2020, Carlos Moral attempted to submit payment in full on his loan through PHH's online payment method with Western Union, but was limited to only submitting $25,000.00.

75.     On November 18, 2020, Carlos submitted payment of $5,000.00 through Western Union.

76.     On November 19, 2020, Carlos submitted payment of $24,999.90, and attempted to submit the remaining amounts owed on the loan but was prevented from doing so.

77.     The following Monday—November 23, 2020—Carlos attempted to make two separate payments through Western Union of $8,550.90 and $6,050.90 to PHH, totaling $14,601.80, but PHH only accepted the payment in the amount of $8,550.90.

78.     PHH temporarily froze the Morals' ability to make further online payments through Western Union.

79.     The payoff quote stated that PHH would simply refund any overpayments made during the mortgage payoff within 20 business days from the date funds were received.  Nothing within the payoff quote suggested there was a

limitation on the amounts that could be sent through PHH's online Western Union payment method, and there was certainly nothing that stated the Morals would be prevented from paying the final amounts through Western Union either.

80.    On November 24, 2020, Carlos spoke with a PHH customer service representative to ask about his problems submitting payoff amounts via Western Union, and was told this did not constitute "certified funds," despite the payoff quote instructing the Morals that this was an accepted payoff method.

81.    Despite having immediately submitting a request for another payoff quote, the Morals did not receive another quote for the remainder of November of 2020.

82.    While there was a net positive in funds contained in the escrow account for the mortgage in the amount of $276.92 as of the end of November of 2020, property taxes on the home applied on December 1, 2020 in the amount of $1,814.32 reduced such escrow balance to a net negative of $1,537.40.

83.    After not receiving a payoff quote again as of December 3, 2020 (as the December 1, 2020 payoff quote generated by PHH was noted as incorrect), Carlos spoke with a PHH customer service representative again and requested to pay off the apparent "$895.97" remaining on the unpaid principal balance of his mortgage as represented on his monthly statement created on December 1, 2021, and was told to go ahead and proceed.

84.    When Carlos Moral submitted $895.97 on December 4, 2020, instead of being applied to the unpaid principal balance upon submission, this was placed

in a suspense account instead, with the reason cited within the servicing notes being that the funds were insufficient to pay off the mortgage.

85.    On December 8, 2020, the Morals submitted another request for a payoff quote.

86.    Having problems getting an accurate and timely payoff quote, the Morals submitted a written notice of error to Ocwen through the CFPB on December 10, 2020.

87.    One payoff quote was generated on December 9, 2020 purporting the total amount due on the loan was $6,107.75, with a valid through date of December 15, 2020.

88.     On December 14, 2020, the Morals received three separate faxes from PHH pertaining to a payoff quote.  Only one such fax actually contained the full information for the payoff quote, which purported the amount owing on the loan was $5,301.78 with a valid through date of December 15, 2020.

89.    On December 21, 2020, PHH responded to the written complaint submitted on behalf of the Morals through the CFPB, and attaching a new payoff quote purporting to have been generated on December 14, 2020 that stated the total amount owed on the loan was $5,302.72, with a valid through date of December 24, 2020.

90.    After encountering further problems submitting final payment online, PHH indicated it would accept the final payment over the phone with an additional

18

fee, and Carlos submitted final payment to PHH in the amount of $5,303.32 with this method on December 29, 2020.

91.    The Morals' final payments were not credited by PHH on the day they were submitted, and were instead applied on January 4, 2021.  No subsequent refund to the Morals resulted.

### Invalid Releases of Plaintiff's Mortgage

92.    After the Morals' loan had been paid in full, they were entitled under the terms of their mortgage agreement to have a release of the lien recorded with the Grant County Register of Deeds.

93.    After seeing no release had been filed as of late January 2021, and eager to ensure their obligations were fully satisfied and no further issues with their mortgage, Carlos Moral began making a series of phone calls to PHH asking for information on the release of their mortgage.

94.    In late January of 2021, Carlos spoke with an employee of PHH that PHH's internal documents confirms went by the name "Todd," who emailed Carlos a copy of the release created for his mortgage, which Carlos intended to take to the Grant County Register of Deeds Office to record himself.

95.    The release Carlos received was purportedly executed on January 19, 2021, and signed by a "Lisa Spurbeck" as "Vice President" of "PHH Mortgage Corporation" as attorney in fact for "Bank One, National Association F/K/A The first National Bank of Chicago as Trustee."  The document was notarized by a "Shoua Lee," stating the release was executed in "Ramsey County, Minnesota."  A

19

copy of the January 19, 2021 release signed by Spurbeck has been attached herein as Exhibit I.

96.     However, the servicing comment logs state that the file related to the Morals' mortgage had been released on January 13, 2021 to "Pratik Panchal," who on information and belief was employed by PHH/Ocwen at an offshore location in India.

97.     The signor of this document, "Lisa Spurbeck," has previously been labeled as a "suspect actor" as part of a comprehensive forensic examination conducted by DK Consultants LLC commissioned by the Clerk of the Circuit Court of Osceola County, Florida of the real property records of Osceola County, Florida in 2014 as part of an investigation into violations of civil and criminal statutes "by virtue of their submission for recordation or filing."  More specifically, the examination stated that mortgage documents prepared by a "Lisa Spurbeck" on behalf of the company "Indecomm Global Services" evidenced a "lack of actual, personal knowledge of the signors" behind these filings.  This practice is referred to in the mortgage servicing industry as "robo-signing."

98.     After receiving the "release," Carlos Moral took it to the Grant County Register of Deeds.  He was shocked when informed by the Register of Deeds that she had actually already received the exact same document for filing, and had rejected it due to its clear inconsistencies with the assignments of record for the Morals' mortgage.

99.    PHH's internal documents show that Carlos Moral called PHH on February 1, 2021 to provide notice of the defective release and the fact that it did not reflect the assignments of record, and was assured that this would be looked into and resolved.

100.   The Morals' anxieties over the circumstances surrounding the release of their mortgage compelled Carlos Moral to call representatives of BNYM directly to enquire about the status of their mortgage.  After several phone calls, Carlos finally managed to reach a representative who could pull the records related to their mortgage.  The Morals were informed that BNYM's records still showed the Morals owed over $115,000.00 on their mortgage, and that BNY Mellon had not received payments related to the mortgage for some time.  When asked why foreclosure proceedings had not been initiated, the Morals were simply told that it must have "fallen through the cracks," and that the Morals were likely the victims of fraud.

101.   The Morals had previously reached out to Trish O'Neal of the Kansas Office of the State Bank Commissioner for assistance on the issue of their release, and O'Neal sent written correspondence submitted by the Morals' on February 5, 2021 to PHH requesting an explanation for the failure to file a valid release of the mortgage.

102.   Through return correspondence dated February 22, 2021, Jyoti Dubey, a consumer account analyst for PHH, responded to the Morals' complaint submitted through O'Neal by stating in part:

> [T]he Morals state the lien should be released from Bank of New York Mellon Trust Company, National Association as the last holder of the note.  We requested the lien release department to review and advise if the satisfaction of mortgage that was sent to the county indicated accurate information.  As per our records, there is no recorded assignment from Bank One to Bank of New York (BONY).  Accordingly, our vendor executed the release from Bank One and sent it for recording on January 22, 2021.

PHH's February 22, 2021 response letter has been attached herein as Exhibit J.

103.    The Morals, in a panic, began contacting multiple parties to try and see what could be done to sort out this problem, including the Register of Deeds for Grant County, Frazee Abstract & Title Inc.—a Title service company in Ulysses—and Kansas Banking Commissioner Trish O'Neal once more, who indicated an investigation of the matter was warranted.

104.    On March 1, 2021, the Morals received notice from the Grant County Register of Deeds that a large stack of releases were filed all at once by an unknown party who claimed he had just driven all the way from Denver, Colorado to the Grant County Register of Deeds Office in Kansas purely for the purpose of filing the stack of releases "immediately."

105.    Included was a "release" for the Morals' mortgage, which was purported to have been signed by "Chris Johnson" as "Vice President" of "Ocwen Loan Servicing, LLC" as attorney in fact for:

> The Bank of New York Mellon Trust Company, National Association f.k.a THE BANK OF NEW YORK TRUST COMPANY, N.A. as successor to JPMORGAN CHASE BANK N.A., AS TRUSTEE FOR RESIDENTIAL ASSET

MORTGAGE PRODUCTS, INC., MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2006-SP3.

The release recorded on March 1, 2021 has been attached herein as Exhibit K.

106.   The name of the trust BNYM acted as trustee on behalf of within the last assignment of record for the Morals' mortgage is inconsistent with the description of the trust provided for within the release.  The Morals discovered after the fact that there are no SEC registered trusts that go by the name of "RAMP 2006-SP3" or "Residential Asset Mortgage Products, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2006-SP3."

107.   A Form 8-K report for the "RAAC Series 2006-SP3 Trust"—published with the SEC on September 14, 2006—identifies the Morals' loan within the pool of mortgages that the trust is comprised of.  Within this public document, which is further incorporated herein by reference, the Morals' loan is identified under RFC Loan Number "363212," and the location of the collateral (i.e. the Morals' home), the original principal balance of the Morals' loan, the loan's maturity date, and the original loan number prescribed by Aames Funding are all accurately stated.  The facts concerning the true name of the trust the defendants are associated with were only discovered by the Morals in early 2022.

108.   The "Mortgage Asset-Backed Pass-Through Certificates, Series 2006-SP3" only represent the interest investors hold in the trust, and are distinguishable from the actual trust itself that BNYM serves as trustee for.

109. On March 12, 2021, Jyoti Dubey of PHH sent follow up correspondence to Trish O'Neal of the Kansas Office of the State Bank Commissioner, who sent this response to the Morals, which stated PHH had

23

corrected the release with the correct party information based on an enclosed "copy of the Assignment of Mortgage" within their records. A copy PHH's March 12, 2021 response to O'Neal is attached herein as Exhibit L.

110. Meanwhile, PHH directly mailed the Morals correspondence also purporting to have been created on March 12, 2021 that stated PHH was still "review[ing] the issues raised." A copy of PHH's March 12, 2021 correspondence to the Morals has been attached herein as Exhibit M.

110. The documents enclosed within PHH's March 12, 2022 correspondence to O'Neal that were purported to have been relied upon by PHH in its review were (1) the unaltered version of the second assignment of record, as discussed in ¶ 22 above, and (2) an incomplete "Assignment of Mortgage/Deed of Trust" purported to have been executed by "Mark Jordan" on April 19, 2006 as "Assistant Vice President" of Bank One's attorney in fact, Residential Funding Corporation. The latter document did not have any named assignee of the mortgage, and was clearly never filed.

111. Following the initial filing of this lawsuit, it was revealed that both "Lisa Spurbeck" and "Chris Johnson" are actually employees of Defendant Indecomm Global Services, not officers of PHH or Ocwen Loan Servicing, LLC as the releases purport.

112. As evidenced by the noted problems with the January 19, 2021 release executed by Lisa Spurbeck that contained verifiably false information concerning the assignments of record pertaining to the Morals' mortgage—which PHH would

have known was patently incorrect based upon its own records in servicing the Morals' mortgage—Indecomm's employees engage in the practice of robo-signing on behalf of mortgage lenders and servicers by executing critical documents affecting the real estate of consumers nationwide without verifying the accuracy of the information contained within such documents.  Indecomm further engages in the practice of misrepresenting the status of its employees as the corporate officers of the entities it is hired by to perform such services to give such documents greater credibility to an unwitting potential title examiner.  In the Morals' case, PHH's reliance on the robo-signing practices of Indecomm resulted in a delay of any release of the mortgage lien being filed at all, and as discussed below, it also resulted in the filing of a release that fails to remove the cloud of the defendants' lien on plaintiffs' home.

## CLAIMS FOR RELIEF

### COUNT 1
### Violations of RESPA

113.    Plaintiffs reallege and incorporate the allegations set forth in the above paragraphs by reference.

114.    The above allegations demonstrate that defendant PHH has violated statutory and regulatory duties owed as servicer of the Morals' mortgage under the Real Estate Settlement Procedures Act ("RESPA") in a manner that has harmed the pecuniary and property interests of the plaintiffs.

115. The actions of PHH described herein resulting in numerous violations of 12 U.S.C. § 2605 of RESPA regarding substantive requirements it was to observe in responding to written notices of errors raised by the Morals including:

(A) Failure to accept payment that conformed with the written requirements provided to the Morals to follow by limiting the Morals' ability to submit payments through Western Union in the manner described above, which resulted in extended delay of the payoff of their loan and additional expenses owed to PHH (12 CFR § 1024.35(b)(1));

(B) Repeated failures to provide accurate payoff balances owed on the Morals' loan (12 CFR § 1024.35(b)(6));

(C) Failure to reasonably oversee the processes of its vendor, Defendant Indecomm, which was necessarily a matter related to PHH's role as servicer and which resulted in invalid releases of the Morals' mortgage lien being sent to Grant County for filing (12 USC § 2605(k)(1)(C); 12 CFR § 1024.35(b)(11)); and

(D) Failure to conduct reasonable investigations of errors brought to PHH's attention by the Morals and failing to correct those errors and errors clearly apparent through such investigation. (12 USC § 2605(e)(2); 12 CFR 1024.35(e)(1)(i)).  PHH's March 12, 2021 letter to the Kansas Office of the State Bank Commissioner purports PHH relied on information within unrecorded documents as part of its investigation in generating a "correct" release of the Morals' mortgage lien that clearly demonstrated further substantive problems underlying the validity of the assignments of record altogether requiring correction.

116. The violations above resulted in damages to the Morals in the form of: (1) the payment of additional and avoidable expenses to PHH due to an unreasonably prolonged payoff process; (2) costs of retaining counsel to aid in the Morals' investigation of PHH's deficient practices and other litigation expenses; (3) damages from mental and emotional distress caused by the confusion resulting

from PHH's practices; and (4) a continuing cloud on the title to their home due to invalid releases being created that were inconsistent with the assignments of record for the Morals' mortgage lien.

117.    Plaintiffs' claims demonstrate a pattern or practice on PHH's part of noncompliance with the requirements of RESPA, permitting the award of additional statutory damages as provided by 12 USC § 2605(f)(1)(B).

## COUNT 2
## Slander of Title/Breach of Contract

118.    Plaintiffs reallege and incorporate the allegations set forth in the above paragraphs by reference.

119.    The release created and filed by the defendants with the Grant County Register of Deeds is patently insufficient to place third parties on notice that the lien on the Morals' home has been properly removed.

120.    The defendants had actual knowledge of the problems in the chain of title for the Morals' mortgage flowing from the recorded assignments with the Grant County Register of Deeds Office.

121.     PHH's production of a copy of the original and unaltered version of the assignment executed by Amy Brackett on February 29, 2000 shows PHH knew the assignment to Bank One filed on January 27, 2003 was fraudulent.

122.    PHH also knew the trust BNYM serves as trustee for was incorrectly named or simply not identified at all in the assignments of record.

123.    Rather than taking steps seeking the execution of corrective assignments or affidavits that would resolve these apparent defects in the chain of

27

title prior to filing a valid release, PHH, by and through Defendant Indecomm, instead double-downed on these errors by filing a release on behalf of an incorrectly-named trust seen nowhere else in the filed assignments of record, signed by an employee PHH knew was falsely holding himself out as a "Vice President" of a non-existent former servicer of the loan.

124.   The defendants intended to quickly file a release to avoid further scrutiny without verifying the accuracy of the assignments of record as compared to the release filed.  The false release created by defendants was malicious, as the defendants drafted and recorded it without reasonable justification or excuse, which has resulted in harm to the plaintiffs' clear title to their home.

125.   Plaintiffs are entitled to damages in the form of expenses made necessary through this instant legal proceeding to seek the removal of the cloud on their title.

## COUNT 4
### Failure to Timely Record Satisfaction of Mortgage

126.   Plaintiffs reallege and incorporate the allegations set forth in the above paragraphs by reference.

127.   K.S.A. 58-2309a, subsection (d), provides:

> Any mortgagee or assignee of a mortgagee who refuses or neglects to enter satisfaction of such mortgage within 20 days after demand has been made . . . shall be liable in damages to the person for whom the demand was made in the sum of $500, together with reasonable attorney's fees for preparing and prosecuting the action.  The plaintiff in such action may recover any additional damages that the evidence in the case warrants.

128.    Defendant PHH failed to file a timely release of the Morals' mortgage in the timeframe set by the above statute after a request was made upon February 5, 2021 for it to file a release, entitling the plaintiffs to a $500.00 statutory penalty, an award of their attorneys fees incurred, and their actual damages resulting from PHH's failure to timely file a valid release.

### COUNT 3
### Violations of the Kansas Consumer Protection Act ("KCPA")

129.    Plaintiffs reallege and incorporate the allegations set forth in the above paragraphs by reference.

130.    As provided by K.S.A. 50-624, a "supplier" is defined as "a manufacturer, distributor, dealer, seller, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer."

131.    A "consumer transaction" is in turn defined as "a sale, lease, assignment or other disposition for value of property or services within this state."

132.    Defendants PHH and Indecomm Global Services are both suppliers as defined under the KCPA.  The role of both defendants was clearly to carry out the terms of a consumer transaction in the form of a mortgage agreement, and their business practices thus fall within the scope of the KCPA's protections afforded to Kansas consumers.

133.    The KCPA declares it unlawful for any supplier to engage in any deceptive act or practice in connection with a consumer transaction.  *See* K.S.A. 50-626.

134.   The KCPA further declares it unlawful for any supplier to engage in any unconscionable act or practice in connection with a consumer transaction, whether it occurs "before, during or after the transaction." *See* K.S.A. 50-627.

135.   The defendants have committed or relied upon deceptive acts and practices as defined by K.S.A. 50-626 by willfully using falsehoods and ambiguities in the creation and filing of the Morals' mortgage release filed with the Grant County Register of Deeds.  Moreover, the plaintiffs have failed to receive a material benefit from the subject of the transaction in the form of clear title to their home.

136.   Defendant PHH outsourced their obligation to file a release of the Morals' mortgage to Indecomm, and in so doing, knowingly allowed employees of Indecomm to draft releases of the Morals' mortgage that contained clearly inaccurate and inconsistent information concerning the transfers of record related to the Morals' mortgage, as discussed herein.  PHH further knowingly permitted Indecomm to allow its employees to execute both release documents as "Vice President" of both PHH and its formerly merged and non-existent legal entity Ocwen Loan Servicing, LLC.

137.   Moreover, Defendant Indecomm knowingly and willingly had its employee, "Lisa Spurbeck," falsely hold herself out as a "Vice President" of Defendant PHH with the requisite authority to sign a release of the Morals' mortgage on behalf of BNYM.  This action was clearly carried out by way of robo-signing, as the release signed by Spurbeck clearly and obviously did not match the recorded assignments of record for the Morals' mortgage, which resulted in further

confusion and emotional turmoil for the Morals resulting from an increased delay in the filing of a release.

138.   Plaintiff Carlos Moral is a "protected consumer" with a physical impairment substantially limiting one or more major life activities as defined under K.S.A. 50-676.

139.   Plaintiffs are entitled to a declaratory judgment that the acts or practices outlined above were in violation of the KCPA's restrictions, to their actual damages linked to the marketability of their home resulting from such practices, or to a civil penalty of up to $10,000 per violation, pursuant to K.S.A. 50-636; and to an enhanced penalty of up to an additional $10,000 pursuant to K.S.A. 50-676 and 50-677; and their attorneys fees pursuant to K.S.A. 50-634.

## COUNT 4
## Fraud and Fraud by Silence

140.   Plaintiffs reallege and incorporate the allegations set forth in the above paragraphs by reference.

141.   Ocwen, succeeded in interest by Defendant PHH, had a duty under RESPA to reasonably investigate and disclose to the plaintiffs information regarding the owner of their mortgage and the validity of the assignments of record for their mortgage lien upon receiving plaintiffs' written requests on the subject from 2015-2017.

142.   When plaintiffs raised concerns regarding the legitimacy of assignments affecting the chain of title for their mortgage—as described above—they were told by Ocwen and Ocwen's agent that any concerns they held were "without merit."

143.    This was a false representation of a material fact of which Ocwen and PHH as its successor had actual knowledge of in light of the fact that (1) they knew the second assignment of record was in fact a sham document that was improperly doctored to a transfer of the mortgage lien; and (2) defendants knew that the promissory note had not been properly assigned and endorsed to BNYM to effect a proper change in ownership of the rights to repayment on the loan.  Furthermore, Defendant PHH knew the mortgage was never properly assigned to the RAAC Series 2006-Sp3 Trust as evidenced by the blank assignment executed by "Mark Jordan" as "Vice President" of Bank One generated in April 2006.  The plaintiffs would have had no means of determining any of these facts until 2021.

144.    While the invalidity of the assignments of record would not negate the Morals' obligation to repay their loan, upon paying off such loan, the Morals were entitled to clear title under the terms of their mortgage agreement.  The defendants could not provide clear title due to their express refusal to record corrective assignments in 2017 that would have resolved the deficiencies in the chain of title for the mortgage, and they took affirmative steps to cover up those deficiencies that the Morals could not have been aware of until 2021.

145.    The Morals justifiably relied upon both the affirmative representations made in Ocwen's agent's legal analysis reputing the existence of any resolvable problem with the assignments of record pertaining to the plaintiffs' mortgage.

147.   Ocwen and PHH as its successor had a duty to acknowledge and correct the deficiencies within the chain of title to the mortgage, and to provide plaintiffs correct information concerning the ownership of their loan.

148.   Ocwen's silence regarding its internal acknowledgement of the deficiencies within its record keeping prevented the plaintiffs from uncovering the full extent of the misinformation Ocwen, and subsequently, PHH would ultimately be providing to its subservicers, vendors, and transferees of the mortgage servicing rights for the plaintiffs' mortgage, which resulted in such misinformation being passed off to its vendor, Indecomm, resulting in the creation of defective releases for the plaintiffs' mortgage and a continuing cloud on plaintiffs' title following the payoff of their loan.

149.   The acts of defendant PHH as successor to Ocwen constitute a wanton and reckless disregard of the plaintiffs' rights, which subjects it to a claim for punitive damages.

WHEREFORE the plaintiffs respectfully pray for a judgment in excess of $75,000, plus their costs and attorneys' fees, and any other and further relief this Court would deem just or equitable.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER, LC

/s/_____
Randall K. Rathbun #09765
Dylan P. Wheeler #28661
8301 E. 21st Street N., Suite 450
Wichita, KS 67206-2936
Telephone: (316) 262-4000
Fax: (316) 265-3819
Email(s): randy@depewgillin.com
dylan@depewgillen.com
*Attorneys for Plaintiffs*

## DESIGNATION OF PLACE OF TRIAL

COME NOW the plaintiffs and designate Wichita, Kansas, as the place of the trial of this action.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER LC

/s/_____
Randall K. Rathbun #09765
*Attorneys for Plaintiff*

## REQUEST FOR JURY TRIAL

COME NOW the plaintiffs and respectfully request a trial by jury with regard to the above-captioned action.

34

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER, LC

/s/_____
Randall K. Rathbun #09765
*Attorneys for Plaintiffs*