Dylan P. Wheeler #28661
8301 E. 21st Street N., Suite 450
Wichita, Kansas 67206-2936
Telephone: (316) 262-4000
dylan@depewgillen.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | | |
|---|---|---|
| CARLOS E. MORAL and | ) | |
| JULIE K. MORAL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 6:21-cv-01070-HLT-TJJ |
| | ) | |
| PHH MORTGAGE CORPORATION; | ) | |
| OCWEN LOAN SERVICING, LLC; | ) | |
| BANK OF NEW YORK MELLON | ) | |
| TRUST COMPANY, NATIONAL | ) | |
| ASSOCIATION; and INDECOMM | ) | |
| HOLDINGS, INC. d/b/a INDECOMM | ) | |
| GLOBAL SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

### RESPONSE TO DEFENDANTS' MOTION TO DISMISS
### AND BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO AMEND

#### INTRODUCTION

*Twombly/Iqbal*'s plausibility standard changed the way lawyers plead cases. It is now a rare case that is not greeted with the obligatory Rule 12(b)(6) Motion to Dismiss. However, it is apparent that some lawyers stopped reading the cases governing pleading after the above cases arose in 2007 and 2009, respectively.

In spite of the defendants' protestations to the contrary in this motion, we have not returned to those thrilling days of Code pleading "when the slip of a sergeant's quill pen

could spell death for a plaintiff's cause of action."[1]  The time has long passed for arguing about whether a plaintiff has correctly pled a claim in trespass de bonis aportatis versus quare clausum fregit.

The Supreme Court reminded us seven short years ago the federal pleading rules call for "a short and plain statement of the claim showing that the pleader is entitled to relief."[2] *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014). *Johnson* involved a claim by police officers that they had been fired for exercising their constitutional rights under the first amendment.  The district court and the Fifth Circuit booted their case because they had not stated the magic words "Section 1983" in their pleadings.  The Supreme Court was not amused.  In a two-page decision, they "summarily reversed" the lower courts and reminded lawyers that:

(1)   "The Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."

(2)   "The Federal Rules of Civil Procedure 'are designed to discourage battles over mere form of statement.'"

(3)   Rule 8(a)(2) "indicates that a basic objective of the rules is to avoid civil cases turning on technicalities."

(4)   "The federal rules effectively abolish the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief."

(5)   The only thing that Twombly and Iqbal concern is "the *factual* allegations a complaint must have to survive a motion to dismiss." (italics in original).

---

[1] "Ancestor worship in the form of ritualistic pleadings has no more disciples.  The time when the slip of a sergeant's quill pen could spell death for a plaintiff's cause of action is past."  *Thompson v. Allstate Ins. Co.*, 476 F.2d 746, 749 (5th Cir. 1973).

[2] That being said, the plaintiffs must admit their complaint is not "short"—but the facts are critical in this case.

*Johnson*, 574 U.S. at 10-12.

In closing, the Supreme Court noted that Rule 15 requires courts to freely give leave to amend when justice so requires, and remanded the case for further proceedings consistent with its opinion.

The courts in this District are likewise cognizant of the post *Twombly/Iqbal* pleading requirements of Rule 8:

- "There is no requirement that a pleading list elements of claims asserted, make legal conclusions about claims asserted, or label the asserted claims." *Kelp v. B & B Lumber Co.*, No. 18-1103-JWB, 2018 WL 3831525, at *3 (D. Kan. Aug. 13, 2018).

- Moreover, although labels and elements may be helpful to a defendant, they are not required under Rule 8. "There is no requirement that a pleading list elements of claims asserted, make legal conclusions about claims asserted, or label the asserted claims." *Mechler v. United States*, No. 12-1183-EFM-GLR, 2012 WL 5289627, at *3 (D. Kan. Oct. 23, 2012).

- "When a complaint provides sufficient notice under Rule 8(1), the defendant should elicit additional detail through the discovery process." *Kelly v. Morton Salt, Inc.*, No. 20-1352-TC, 2021 WL 1821819, at *2 (D. Kan. Mar. 1, 2021).

With the above pleading rules in mind, let's take a look at the defendants' brief (Doc. 53).

## I. STATEMENT OF FACTS

The Court's ruling on this motion will be guided by the facts as alleged in the plaintiffs' First Amended Complaint (Doc. 40). As noted below, the Court must take well-pleaded facts as true, view them in a light most favorable to plaintiffs, and draw all reasonable inferences from the facts in favor of plaintiffs. Relevant facts are set forth below, word-for-word from the complaint:

11.     On February 25, 2000, the Morals executed a mortgage agreement ("the mortgage") to Aames Funding Corporation, a California Corporation, DBA Aames Home Loan.  The mortgage was recorded with the Grant County Register of Deeds Office on February 28, 2000 in Book 202 at pages 231–42, securing the original sum of $132,750.00.

12.     The funds secured through the mortgage agreement were applied to the purchase price of the Morals' home, located at 816 North Joyce, Ulysses, KS 67880.

13.     On January 22, 2002, an assignment of the mortgage was recorded in Book 212 at pages 293–95 with the Grant County Register of Deeds Office that was allegedly executed by Aames Funding Corporation on December 26, 2001 in favor of "Aames Capital Corporation."   The document states that it was signed by Josephine Naces, "Assistant Secretary" of Aames Funding Corporation, DBA Aames Home Loan.

14.     On January 27, 2003, an assignment of the mortgage from Aames Capital Corporation to "Bank One National Association, as Trustee" was recorded with the Grant County Register of Deeds Office in Book 218 at pages 125–27, even though the same document purports to have been executed three years prior on February 29, 2000 by "Amy Brackett"—allegedly the Secretary of Aames Capital Corporation—meaning it would have preceded the execution of the assignment to Aames Capital Corporation from Aames Funding Corporation by nearly two years.

15.     Bank One subsequently merged with JPMorgan Chase & Co. in July of 2004, and later events indicate that the note securing the mortgage was placed in the possession of the banking entity born from that merger, JPMorgan Chase Bank N.A.

16.     Yet another assignment of the mortgage was recorded on June 16, 2008 in the Grant County Register of Deeds Office in Book 249 at pages 227–29, this time from

Bank One National Association, as Trustee, c/o HomeComings Financial, LLC (TX) to "The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A. as Trustee, c/o HomeComings Financial, LLC (TX)" and allegedly executed by a Frank Ruhl as "Vice President" of Bank One National Association on June 3, 2008.

17.     Another assignment of the mortgage was recorded in the Grant County Register of Deeds Office on June 15, 2009 at Book 254, pages 425–26.  This assignment purports to have assigned the mortgage from The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A., as Trustee, c/o RESCAP (GMAC) DBA HomeComings Financial, LLC (TX) to "The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A. as Trustee for RAMP 2006SP3, c/o RESCAP (GMAC) DBA HomeComings Financial, LLC (TX)."  This document purports to have been executed on June 4, 2009 by, once again, Frank Ruhl, this time as "Vice President" of The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A. as Trustee.

**Ocwen's History as Mortgage Servicer**

18.     Based upon information and belief, HomeComings Financial, LLC was founded by General Motors Acceptance Corporation ("GMAC"), and became a subsidiary to GMAC's Residential Capital Corporation ("RESCAP"), itself an entity created specifically by GMAC as a place to stow all of its problematic divisions linked to the servicing of residential mortgages.  HomeComings Financial, LLC was the entity to which the Morals initially began submitting payments on their mortgage until RESCAP assumed the servicing of the mortgage itself, but in HomeComings Financial, LLC's name. HomeComings Financial, LLC and RESCAP d/b/a HomeComings Financial, LLC eventually experienced serious financial difficulties as a result of their exposure to the

subprime lending mortgage crisis of 2008, and underwent liquidation in December of 2013 as part of the terms of bankruptcy filings.

19.    Since RESCAP's and HomeComings Financial, LLC's liquidation, Defendant Ocwen began servicing the mortgage.

20.    A servicer who does not originate a mortgage loan may become the servicer by purchasing the "mortgage servicing rights" or by entering into a contract with the "master servicer" to act on its behalf as "subservicer." Such transfers can occur at various stages of repayment of the mortgage, including where the borrower is delinquent in payments and may seek loss mitigation assistance from the servicer to avoid foreclosure on the loan. Borrowers do not choose their mortgage servicer and have no control over whether and how their loans are serviced.

21.    Between 2010 and the first quarter of 2014, Ocwen's residential servicing portfolio grew from 351,595 loans with an aggregate unpaid principal balance of approximately $465 billion. Ocwen's largest acquisition during this time period was its 2013 purchase of Residential Capital, LLC's ("Residential Capital") servicing platform and it mortgage servicing rights to 1,740,000 loans with an aggregate unpaid principal balance of approximately $183.1 billion. As of December 31, 2016, Ocwen serviced approximately 1,393,766 loans with an aggregate unpaid principal balance of approximately $209 billion. Its loans are located in all fifty states and the District of Columbia.

22.    Fundamental functions of a mortgage servicer include processing and applying borrower payments, communicating accurate payment information to borrowers, managing escrow accounts, and maintaining accurate loan balance information.

23.     Servicers also respond to borrower inquiries, handle loss mitigation requests, and initiate foreclosure proceedings, among other functions.

24.     To perform these tasks, servicers input loan and borrower information into electronic databases, often referred to as systems of record.  Systems of record are essential to a servicer's ability to service loans in accordance with applicable legal requirements.  If the information the servicer inputs into the system of record is inaccurate, or the system itself has deficiencies that produce inaccurate information even when the servicer inputs correct information, a servicer can make critical errors that harm borrowers.

25.     Until 2019, Ocwen utilized a proprietary system of record, REALServicing, and is related sub-systems (collectively "REALServicing").

26.     The REALServicing proprietary system of record has been the subject of a number of Consumer Protection lawsuits due to noted system architecture and design flaws resulting in improperly managed data, lack of automation, and lack of capacity. These flaws compounded in such a manner that adversely impacted the accuracy of information that Ocwen used to service loans—and thus, Ocwen's ability to service loans— in a number of ways.

27.     These deficiencies and flaws within the REALServicing proprietary system utilized by Ocwen resulted in Ocwen's inability to (i) accurately identify the lenders in possession of notes secured by borrowers' mortgages being serviced by Ocwen, (ii) accurately identify assignments of the underlying mortgages, (iii) provide accurate information to borrowers submitting information requests regarding such errors, and (iv) timely correct such errors.  The REALServicing proprietary system further resulted in

Ocwen failing to timely credit and apply borrower payments, and provide accurate information thereof to borrowers upon request.

28.     These deficiencies within Ocwen's REALServicing propriety system further resulted in inaccurate information on borrower's loans being transmitted to its subservicers.

## Plaintiffs Raise Concerns

29.     From 2015 to 2017, the Morals raised questions regarding the accuracy of the various assignments of record pertaining to their mortgage and Ocwen's claimed legal authority to act as servicer thereof.

30.     However, Ocwen's internal notes only received by the Morals on December 13, 2021 shows that Ocwen's personnel were distinctly aware in 2017 that there were problems with the assignments of record for the Morals' mortgage.

31.     These internal documents reveal an entry made by Ocwen personnel on February 8, 2017, that "Wells Fargo" was in physical possession of the original note secured by the Morals' mortgage.

32.     On March 1, 2017, an entry was made within Ocwen's internal documents regarding the servicing of the Morals' mortgage that stated "[t]his is a cloudy title issue. Please forward the concerned department and verify the same.. Complete incorrect research and response."

33.     These internal documents further contain an entry made on May 11, 2017, stating "ASSIGNMENT MISSING – REQUEST TO CONTRACT MANGMT."

34.     Despite the noted appearance of problems regarding the accuracy of information surrounding the Morals' mortgage made by Ocwen personnel within their own internal notes, Ocwen had its Kansas City attorney, Jonathan D. Nicol of Bryan Cave

LLP, mail the Morals a letter on May 12, 2017 providing seemingly-learned assurances that the Morals' complaints regarding the legitimacy and accuracy of the assignments underlying their mortgage were "without merit." The Morals—without access to the resources or internal documentation of Ocwen showing steps taken by Ocwen personnel to cover up the deficiencies in their record keeping—had no reason to dispute Nicol's analysis prepared for the purpose of persuading them to take no further action or investigate further.

35.     On May 16, 2017, Ocwen's internal documents show that an "[e]xecutable new assignment" was drafted and assigned for execution, apparently generated as an assignment of the Morals' mortgage from "bank one national association as trustee" to "The Bank of New York Mellon Trust Company National Association f/k/a The Bank of New York Trust Company N.A. as successor to JP Morgan Chase Ban[k]." The assignment document was purportedly executed and "sent to vendor for recording" on May 26, 2017.

36.     Subsequent entries made by Ocwen personnel express further problems in Ocwen's attempts to verify its internal information and the accuracy of entities associated with the Morals' mortgage.

## Ocwen's Acquisition of Servicing Rights

37.     In July of 2017, an agreement between Ocwen and New Residential Investment Corp. was announced regarding a transfer of mortgage servicing rights held by Ocwen for loans valued at approximately $110 billion in unpaid principal balance to New Residential Mortgage LLC ("NRM"), a wholly owned subsidiary of New Residential Investment Corp. Pursuant to this agreement, a 5-year subservicing agreement was entered between NRM and Ocwen in which Ocwen would subservice the mortgage loans underlying the transferred mortgage servicing rights. Pursuant to this agreement, New

Residential Investment Corp. agreed to make an equity investment of approximately $13.9 million to purchase approximately 4.9% of Ocwen's common equity.

38.     On October 4, 2018, Ocwen announced its complete acquisition of PHH, whereby PHH became a wholly-owned subsidiary of Ocwen.  The intent of Ocwen's acquisition of PHH was to make PHH the subservicer of the loans serviced by Ocwen, including the loans Ocwen subserviced on behalf of NRM.

39.     PHH has represented in these proceedings that it did not merge with Ocwen until June 1, 2019, and that PHH assumed servicing of the Morals' loan on that date.  (Doc. 11, ¶ 23)

40.     Ocwen announced on June 10, 2019 that it has completed the final phase of its loan transfer process and transition from the REALServicing proprietary system to the "Black Knight LoanSphere® MSP Platform ("MSP")," in which Ocwen transferred "approximately one million loans to the MSP platform" following "a significant amount of preparation, training, rigorous pre-boarding testing and customer communications." Ocwen's June 10, 2019 announcement stated that, "[i]n addition to the loan transfers and system conversion to MSP, Ocwen completed the merger of its licensed legal entity, Ocwen Loan Servicing, into PHH Mortgage Corporation."

## Plaintiffs' Attempts to Pay Off Mortgage

41.     The Morals struggled financially for a number of years in paying off their mortgage while the mortgage and documents associated therewith were repeatedly exchanged between various servicers and lenders since the mortgage first came into creation nearly two decades ago, and had been threatened with foreclosure.

42.     However, in November of 2020, the Morals believed their luck had changed when a substantial inheritance finally placed them in a position to fully pay off the substantial sums still owing on their mortgage in full, which they made their first priority.

43.     When notifying PHH of their intent to pay off the loan in full, they immediately encountered problems with PHH's payoff procedure, both in their ability to receive accurate and timely payoff statements, as well as the manner in which PHH credited those payments on the Morals' account statements.

44.     The Morals initially requested a payoff quote for the mortgage on November 11, 2020.

45.     PHH's internal documents show that the requested payoff quote was not approved for sending until November 16, 2020, with such payoff quote reflecting that the total amount due on the loan as of November 12, 2020 was $68,206.31, with such payoff quote having a valid through date of November 22, 2020.

46.     On November 17, 2020, after having received no prior instructions or information on when he could expect to receive the payoff quote requested on November 11, 2020, or whether the requested method of payment would differ in kind from that previously accepted by PHH/Ocwen, Carlos Moral decided to simply begin submitting payments online, paying the maximum daily-figure inexplicably allotted by PHH for such payments of $25,000 a day.

47.     On November 17, 2020, Carlos Moral paid $25,000 to PHH.

48.     On November 18, 2020, Carlos Moral paid $5,000 to PHH.

49.     On November 19, 2020, Carlos Moral paid $24,999.90 to PHH.

50.     On November 23, 2020, Carlos Moral attempted submitted two separate payments of $8,550.90 and $6,050.90 to PHH, totaling $14,601.80, but PHH only accepted payment of the payment in the amount of $8,550.90.

51.     PHH temporarily froze the Morals' ability to make further online payments.

52.     From November 17, 2020 to November 23, 2020, the Morals had already paid $63,550.80 to PHH on their mortgage loan through submitting payments online, just $4,655.51 short of the November 12, 2020 payoff quote.

53.     Despite there being no issues for PHH in its receipt and crediting of other payments on their mortgage through PHH's online portal—outside of the online payment of $6,050.90 it chose to reject—PHH personnel insisted that the Morals could only submit a full final payoff through the use of certified funds.  This was a self-imposed policy previously uncommunicated to the Morals, and PHH was not actually prevented pursuant to law or other regulations related to mortgage servicers from simply accepting the submitted payment of $6,050.90, utilizing an alternative accepted means to verify its accuracy, and subsequently refunding any overpayment.

54.     Despite having immediately requested another payoff quote, the Morals did not receive another quote for the remainder of November of 2020.

55.     While there was a net positive in funds contained in the escrow account for the mortgage in the amount of $276.92 as of the end of November of 2020, property taxes on the home applied on December 1, 2020 in the amount of $1,814.32 reduced such escrow balance to a net negative of $1,537.40.

56.     After not receiving a payoff quote again as of December 3, 2020 (as the December 1, 2020 payoff quote generated by PHH was noted as incorrect), Carlos Moral spoke with a PHH customer service representative and requested to pay off the apparent

12

$895.97 remaining on the unpaid principal balance of his mortgage as represented on his monthly statement created on December 1, 2021, and was told to go ahead and proceed.

57.     When Carlos Moral submitted $895.97 on December 4, 2020, instead of being applied to the unpaid principal balance upon submission, this was placed in a suspense account instead, with the reason cited within the servicing notes being that the funds were insufficient to pay off the mortgage.

58.     Several payoff quotes for the Morals' mortgage were generated in early December by PHH.  One such payoff quote, created on December 9, 2020, stated the total amount owing on the mortgage was $6,197.75, with a valid through date of December 15, 2020.  Another was drafted on December 14, 2020 that subtracted the previously paid amount of $895.97 to reflect a total amount owing on the mortgage as $5,301.78, with a valid through date of December 15, 2020.  The latter payoff quote is noted within PHH's internal documents as having been faxed directly to the Morals on the 14th, who received it the same day.  Yet another payoff quote was purportedly drafted on the exact same day, December 14, 2021, this time reflecting the amount owing on the mortgage as $5,302.72 with a valid through date of December 24, 2020.

59.     After PHH indicated it would accept final payments over the phone, Carlos Moral submitted separate payments in the amount of $1,000 on December 28, 2020, and $4,303.32 on December 29, 2020.

60.     Another payoff quote was generated by PHH on December 30, 2020, reflecting the total amount still owing on the mortgage was $5,413.67 with a valid through date of January 9, 2021.

61.     After the Morals submitted payments at the end of December, Carlos Moral complained on January 4, 2021 that the paid amounts had not yet been applied by PHH.

Following this complaint, PHH's internal documents show the manner it allegedly applied funds held in suspense to zero out the remaining amounts appearing on the Morals' statements, which resulted in no refund to the Morals.

62.     The Morals paid a total of $69,750.09 to PHH from November 17, 2020 to December 29, 2020.

### Invalid Releases of Plaintiffs' Mortgage

63.     After the Morals' mortgage had been paid in full, PHH had the duty to file a release of the Morals' mortgage with the Grant County Register of Deeds Office.

64.     After seeing no release had been filed as of late January 2021, and eager to ensure their obligations were fully satisfied and no further issues with their mortgage and title would occur, Carlos Moral began making a series of phone calls to PHH asking for information on the release of their mortgage.

65.     On or about January 19, 2021, Carlos Moral convinced a PHH employee he believes went by the name "Tom" to email him a copy of the release created for his mortgage, which he intended to take to the Grant County Register of Deeds Office to record himself.

66.     The release Carlos Moral received was purportedly executed on January 19, 2021 in Ramsey County, Minnesota, and signed by a "Lisa Spurbeck" as "Vice President" of "Bank One, National Association F/K/A The First National Bank of Chicago as Trustee by PHH Mortgage Corporation Successor by Merger to Ocwen Loan Servicing, LLC Successor in Interest to Ocwen Federal Bank FSB Its Attorney in Fact."

67.     Notably, "Lisa Spurbeck"—who according to the Notary Registry for the State of Minnesota was a notary herself prior to her commission expiring on January 31, 2018—had previously been labeled as a "suspect actor" as part of a comprehensive

forensic examination conducted by DK Consultants LLC commissioned by the Clerk of the Circuit Court of Osceola County, Florida of the real property records of Osceola County, Florida in 2014 as part of an investigation into violations of civil and criminal statutes "by virtue of their submission for recordation or filing."  More specifically, the examination stated that mortgage documents prepared by a "Lisa Spurbeck" on behalf of the company "Indecomm Global Services" evidenced a "lack of actual, personal knowledge of the signors" behind these filings.  This practice is referred to in the mortgage servicing industry as "robo-signing."

68.    Carlos Moral subsequently took this "release" purported to have been signed by Lisa Spurbeck as "Vice President" of Bank One, National Association (which had already long-been merged out of existence at that point in time) to the Grant County Register of Deeds for filing.  Carlos was shocked when he was informed by the Register of Deeds that she had actually already received the exact same document prior, and had rejected it due to its clear inconsistencies with the purported assignments on file. According to the filings of record, BNY Mellon was the holder of the note and was thus the entity that would be required to file the release.

69.    Ocwen/PHH's own personnel knew as far back as 2017 of the issues in their record keeping compared to the assignments of record, and that there was a cloud on the title to the Morals' title resulting from such deficient records.

70.    PHH's internal documents show that Carlos Moral called PHH on February 1, 2021 to provide notice of the defective release and the fact that it did not reflect the assignments of record, and was assured that this would be looked into and resolved.

71.    PHH's internal documents further state that Carlos Moral again called PHH on February 8, 2021 asking about the status of the Morals' mortgage release, and was told

that PHH had "corrected the lien release doc," and a copy would eventually be emailed to him.  Carlos, however, specifically remembers the representative he discussed the issue with telling him that PHH was not going to change the lien release and to stop calling them.

72.    The Morals had previously reached out to Trish O'Neal of the Kansas Office of the State Bank Commissioner for assistance on the issue of their release on February 5, 2021, and O'Neal sent correspondence to PHH requesting clarification on the issue.

73.    In its return correspondence dated February 22, 2021, PHH represented that:

> [T]he Morals state the lien should be released from Bank of New York Mellon Trust Company, National Association as the last holder of the note.  We requested the lien release department to review and advise if the satisfaction of mortgage that was sent to the county indicated accurate information.  As per our records, there is no recorded assignment from Bank One to Bank of New York (BONY). Accordingly, our vendor executed the release from Bank One and sent it for recording on January 22, 2021.

74.    The Morals' anxieties over the circumstances surrounding the release of their mortgage compelled Carlos Moral to call Bank of New York Mellon directly to enquire about the status of their mortgage.  After several phone calls, Carlos finally managed to reach a representative who could pull the records related to their mortgage. The Morals were informed that BNY Mellon's records still showed the Morals owed over $115,000.00 on their mortgage, and that BNY Mellon had not received payments related to the mortgage for some time.  When asked why foreclosure proceedings had not been initiated, the Morals were simply told that it must have "fallen through the cracks," and that the Morals were likely the victims of fraud.

75.     The Morals, in a panic, began contacting multiple parties to try and see what could be done to sort out this problem, including the Register of Deeds for Grant County, Frazee Abstract & Title Inc.—a Title service company in Ulysses—to gain an independent expert opinion, and Kansas Banking Commissioner Trish O'Neal once more, who indicated an investigation of the matter was warranted.

76.     The title opinion generated by Frazee Abstract & Title Inc. confirmed to the Morals that the release provided by PHH was defective.

77.     However, the plot thickened in a most unusual manner when, on March 1, 2021, a very large stack of "releases" was filed all at once by—upon information and belief—an unknown party who claimed he had just driven all the way from Denver, Colorado to the Grant County Register of Deeds Office in Kansas purely for the purpose of filing the stack of releases "immediately."

78.     The filed document was allegedly executed on February 25, 2021 by a "Chris Johnson" as "Vice President" of "The Bank of New York Mellon Trust Company, National Association f.k.a. The Bank of New York Trust Company, N.A. as Successor to JPMorgan Chase Bank, N.A. as Trustee for Residential Asset Mortgage Products, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2006-SP3 by Its Attorney in Fact Ocwen Loan Servicing, LLC."

79.     One noticeably strange aspect of the document is that, just like the previous defective release, it purports to have been executed by Chris Johnson in "Ramsey County, Minnesota," even though BNY Mellon has no corporate offices whatsoever in Minnesota.

80.     Carlos Moral, attempting to look into the existence of the "Chris Johnson" whose name appears on the filed mortgage release, found one such officer of BNY Mellon

bearing the name who was located in the corporate offices of BNY Mellon's office in Los Angeles, California.

81.     This "Chris Johnson" was questioned by Carlos Moral on the apparent use of his signature on the "release" purportedly executed in Ramsey County, Minnesota. "Chris Johnson" confirmed that he had never signed any such document on the date in question, nor did he have any reason to be in Ramsey County, Minnesota at all.  It was believed that Chris Johnson's signature must have been forged, which has not yet been confirmed.

82.     After this new release was filed with the Grant County Register of Deeds, PHH mailed follow-up correspondence to O'Neal of the Kansas Office of the State Bank Commissioner to express the issue with the release for the Morals' mortgage had been resolved.  Attached to this letter were documents apparently submitted to O'Neal for the purpose of proving they got it right this time around.

83.     One of the documents PHH sent to O'Neal, oddly enough, was an "Assignment of Mortgage/Deed of Trust" purportedly executed by "Mark Jordan" as "Assistant Vice President of Bank One National Association as Trustee, Residential Funding Corporation as Attorney in Fact."  The document oddly has a blank spot where the "Assignee" of this assignment should be, and nevertheless, purports to have been executed on April 19, 2006 and even notarized by an "Adele M. Dolan," a notary public supposedly located in Minnesota.

84.     Following the filing of the instant lawsuit, new explanations were provided to the Morals for the first time regarding the allegedly true identity of the "Chris Johnson" whose signature appears on their mortgage release filed on March 1, 2021.

85.     It has been the position of the defendants that "Chris Johnson" is actually an employee of a vendor for Ocwen, "Indecomm Global Services."

86.     In fact, both Lisa Spurbeck and Chris Johnson have been represented to be employees of Indecomm.

87.     The Morals were wholly unaware at all relevant times that BNY Mellon/Ocwen/PHH would utilize Indecomm to execute documents pertaining to their mortgage and property—i.e. the preparation, notarization, delivery, and recording of the release of their mortgage.

88.     No disclosure of Indecomm's affiliation with the other defendants was provided, and the Morals were not provided an option in their provider of settlement services related to the execution and recordation of release of the loan.

89.     As evidenced by the noted problems with the January 19, 2021 release executed by Lisa Spurbeck which contained verifiably false information concerning the assignments of record pertaining to the Morals' mortgage—which Ocwen knew or should have known based upon its own notes in servicing the Morals' mortgage—Indecomm's employees engage in the practice of robo-signing on behalf of mortgage lenders and servicers by executing critical documents affecting the real estate of consumers nationwide without verifying the accuracy of the information contained within such documents.  Indecomm further engages in the practice of misrepresenting the status of its employees as the corporate officers of the entities it is hired by to perform such services to give such documents greater credibility to an unwitting potential title examiner.

90.     Despite Ocwen's apparent affiliation with New Residential Mortgage LLC and PHH, BNY Mellon has not produced any instruments purporting to directly provide Ocwen with power of attorney over the mortgages owned by BNY Mellon.

19

. . .

92.     The above allegations demonstrate that defendants PHH and Ocwen have violated statutory and regulatory duties owed as servicers of the Morals' mortgage under the Real Estate Settlement Procedures Act ("RESPA") in a manner that has harmed the pecuniary interests of the plaintiffs.

93.     More specifically, these defendants have failed to take timely action in responding to the plaintiffs' requests to correct errors relating to the allocation of payments, final balances for purposes of paying off the mortgage, and other standard servicer duties.

94.     These defendants also failed to provide the Morals timely and appropriate notices regarding the transfers upon the servicing of their mortgage, and have not demonstrated they are exempt from such notice requirements.

95.     Defendant Indecomm has violated RESPA's prohibitions against kickbacks and unearned fees under 12 U.S.C. § 2607 and associated regulations by accepting fees and other things of value from defendants Ocwen and/or PHH for performing business incident to or a part of a real estate settlement service involving a federally related mortgage loan that the Morals were required to use.

96.     Further violations of the requirements of RESPA and its regulatory scheme include: (1) failing to provide accurate and timely disclosures to the Morals regarding the servicing of their mortgage; (2) failing to investigate, respond to, and make appropriate corrections in response to complaints asserted by the Morals; (3) failing to provide the Morals with accurate and timely information and documents in response to the Morals' requests for information; (4) failing to provide the Morals with accurate and current information and documents of the mortgage loans they own; (5) failing to provide their

own personnel with access to accurate and current documents; (6) failing to accept payment that conforms to the servicer's written requirements for borrowers to follow in making payments; (7) failing to apply an accepted payment to the principal, interest, escrow, or other charges under the terms of the mortgage loan and applicable law; (8) failure to provide an accurate payoff balance upon the Morals' request; (9) generally taking other actions in error related to the servicing of the Morals' mortgage loan; and (10) failing to conduct a reasonable investigation of the errors complained of and other errors that should have been readily apparent, and failing to then correct those errors.

97.    The above-alleged violations of RESPA have resulted in actual damages to the Morals in the form of: (1) Lost time spent in investigation of the defendants' failure to comply with their statutory duties; (2) costs of retaining counsel to aid in the Morals' investigation of the matter and other litigation expenses; (3) severe mental anguish affecting the health and well-being of the Morals induced by associated stress; (4) the loss in marketability of their home due to the cloud placed on their title due to the ineffective releases; and (5) other related damages resulting directly from the defendants' violation of their statutory duties.

        . . .

100.    The various payoff quotes provided to the Morals by PHH throughout November and December of 2020, discussed above, were riddled with inaccurate and misleading information, including duplicative payoff quotes representing the same valid through date with different figures provided for the remaining amounts purportedly owed by the Morals.

101.    The failure of PHH to provide accurate and timely payoff balances resulted in damages to the Morals due to the confusing nature in which they were drafted and

provided, resulting in a delay of the Morals' payoff of their loan and excessive payments being made.

. . .

103.   The performance of services relating to the servicing of the plaintiffs' mortgage by the defendants constitutes a "consumer transaction" as that term is defined by K.S.A. 50-624(c) of the KCPA.

104.   Each defendant named herein is a "supplier" in connection to a consumer transaction as that term is defined under K.S.A. 50-624(l) of the KCPA.

105.   The KCPA declares it unlawful for any supplier to engage in any deceptive act or practice in connection with a consumer transaction.  *See*  K.S.A. 50-626.

106.   The KCPA further declares it unlawful for any supplier to engage in any unconscionable act or practice in connection with a consumer transaction, whether it occurs "before, during or after the transaction."  *See* K.S.A. 50-627.

107.   The loan servicing conduct of PHH, Ocwen, and Indecomm, as described above, constitute deceptive acts or practices in violation of Kansas law.

108.   PHH and Ocwen have willfully relied upon written representations and falsehoods as to material facts regarding the existence of underlying issues clouding the title of the Morals' home, as described above, and have made further misrepresentations to plaintiffs and the Kansas Office of the State Bank Commissioner for the purpose of concealing such problems.

109.   Indecomm has committed unconscionable acts or practices through utilizing a business model resulting in the fraudulent execution of numerous important real estate documents by its employees for submitting the same within the real property

records linked to homeowner's mortgages.  Defendants PHH and Ocwen have directly encouraged and profited tremendously from Indecomm's scheme.

110.    Indecomm's business model inevitably encourages its employees to engage in robo-signing, described above.  In the present case, the release documents related to the Morals' mortgage generated by Indecomm resulted from such robo-signing, and the deficiency of such documents is compounded by the fact that Indecomm's employees falsely represent themselves as officers of the entities who facially have authority to execute such documents on behalf of lenders and servicers.

111.    The plaintiffs have suffered actual damages as a result of the defendants' deceptive and unconscionable acts and practices in the form of a cloud upon their title, expenses made in investigating and attempting to correct this unlawful conduct by defendants, and other damages.

. . .

114.    Upon receiving notice of the plaintiffs' concerns raised in regards to the accuracy and legitimacy of the assignments of record pertaining to their mortgage and the authority provided by such documents, Ocwen, through its agent, represented in correspondence to the plaintiffs on May 12, 2017 that any such concern was "without merit."

115.    This was a false representation of material fact of which Ocwen had actual knowledge of in light of its internal documents received by plaintiffs on December 13, 2021 showing that Ocwen personnel were taking affirmative steps to discern such problems with the assignments of record and quietly cover them up both immediately before and after its agent represented there were no concerns to be had.

23

116.    Ocwen's internal documents expressly indicated it was investigating a "cloudy title issue" as of March 1, 2017, and noted there was an "assignment missing" on May 11, 2017, just a day before its agent sent his letter to the Morals stating there were no such problems.

117.    Ocwen's internal documents further show that it took affirmative steps to create and execute an assignment purporting to transfer the Morals' mortgage to BNY Mellon on May 26, 2017.

118.    Ocwen was under an obligation to communicate both the issues it saw with the assignments of record, and could not be innocently silent as its agent provided false statements to the Morals regarding such deficiencies.

119.    The Morals justifiably relied upon both the affirmative representations made in Ocwen's agent's legal analysis reputing the existence of a potential problem with the assignments of record pertaining to the plaintiffs' mortgage, and upon Ocwen as a servicer of their loan subject to statutory and regulatory duties to provide accurate information to the plaintiffs regarding their right to service the plaintiffs' mortgage.

120.    Alternatively, Ocwen's silence regarding its internal acknowledgement of the deficiencies within its record keeping prevented the plaintiffs from uncovering the full extent of the misinformation Ocwen, and subsequently, PHH would ultimately be providing to its subservicers, vendors, and transferees of the mortgage servicing rights for the plaintiffs' mortgage, which resulted in such misinformation being passed off to its vendor, Indecomm, resulting in the creation of defective releases for the plaintiffs' mortgage.

121.    The acts of defendant Ocwen constitute a wanton and reckless disregard of the plaintiffs' rights, which subjects it to a claim for punitive damages.

123.    In filing demonstrably falsified and thus invalid releases of the plaintiffs' mortgage with the Grant County Register of Deeds Office, the servicer defendants permitted to be publicized a false written statement that foreseeably impaired the value of the property in the estimation of others due to the cloud upon their title the falsified releases create.

124.    Each of the above-captioned defendants have acted in some capacity as either servicers or holders of the note securing the Morals' mortgage, and whether it be through their intentional actions or gross negligence, each of the defendants shoulder varied amounts of responsibility for the circumstances that have acted to impair the value of the Morals' property in this matter.

125.    As a result of the defendants' slander of title as to the Morals' property, the Morals have suffered damages in the form of lost opportunity in the resale of their home, severe mental anguish, and the cost of legal expenses that have become necessary in order to clear the cloud upon their title.

## II. Arguments and Authorities[3]

### A. Standards

**Standard on a motion to dismiss**

In a motion to dismiss under Rule 12(b)(6) the Court applies the *Iqbal/Twombly* standard to determine whether plaintiffs have stated a plausible claim. *Brooks v. Mentor Worldwide LLC,* 985 F.3d 1272, 1281 (10th Cir.), cert. denied, 142 S. Ct. 477, 211 L. Ed. 2d 289 (2021). The lens through which the Court must view the laintiffs' allegations is well-known:

> In applying this standard, we take Plaintiffs' well-pleaded facts as true, view them in the light most favorable to Plaintiffs, and draw all reasonable inferences from the facts in favor of Plaintiffs.

*Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021), cert. denied 142 S. Ct., 211 L.Ed. 2d 289 (2021).

**Standard on Motion for Leave to Amend**

Rule 15(a) provides that courts should "freely give leave" for a party to amend its pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). The decision whether to grant leave to amend is within a district court's sound discretion. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.,* 401 U.S. 321, 330 (1971); *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006). "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993).

---

[3] Plaintiffs have elected to dismiss the Dodd-Frank cause of action in the proposed Second Amended Complaint

"A proposed amendment is futile if the complaint, as amended, would be subject to dismissal for any reason[.]" *Watson ex rel. Watson v. Beckel,* 242 F.3d 1237, 1239-40 (10th Cir. 2001). "'The futility question is functionally equivalent to the question whether a complaint may be dismissed for failure to state a claim[.]'" *Adams v. C3 Pipeline Constr. Inc.,* 17 F.4th 40, 69 (10th Cir. 2021) (quoting *Gohier v. Enright,* 186 F.3d 1216, 1218 (10th Cir. 1999)).

## B. THE PLAINTIFFS' RESPA CLAIMS

Defendant PHH's arguments requesting outright dismissal of the plaintiffs' RESPA claims are largely based on repeatedly asserting a single phantom technicality. PHH professes that plaintiffs' pleadings do not state whether the various notices of servicing errors underlying their RESPA claims were "in writing," and that this must be taken as an incurable and fatal defect entitling it to outright dismissal of the claims.

While many of plaintiffs' allegations discuss the ongoing phone calls held with PHH's customer service representatives throughout the process of paying off their mortgage and having a release recorded, these allegations largely just contextualize the plaintiffs' frustrations when dealing directly with PHH's employees. PHH's argument latches onto and conflates these allegations with plaintiffs' more simply pleaded statement that they "made requests to correct errors" that serve as the actual basis for their RESPA claims. *See* Compl. ¶ 93. If read in a light most favorable to plaintiffs, the allegation can fairly be read to mean that such requests were *written* requests, and the defendant is free to test the sufficiency of this aspect of plaintiffs' RESPA claims through discovery.

Moreover, defendant conveniently breezes over those allegations discussing the series of correspondence submitted on their behalf by Trish O'Neal of the Kansas Office

of the State Banking Commissioner to PHH directly pertaining to PHH's failure to record a release in January of 2021. *See* Compl. ¶¶ 72-73, 82-83. A servicer of a home loan is necessarily responsible for recording documents related to the underlying mortgage, and notices of error regarding a failure to properly record such documents bring a servicer within the scope of the remedies afforded by RESPA and its associated regulations. *See Naimoli v. Ocwen Loan Servicing, LLC*, 22 F.4th 376, 382-383 (2nd Cir. 2022) (holding that a servicer's mismanagement of loan documents by failing to record the same "is a covered error under § 1024.35(b)'s catch-all provision").

To the extent further clarification over the various *written* notices of error pertaining to plaintiff's' RESPA claims at this stage is required, plaintiffs believe their Second Amended Complaint —attached as Exhibit A herein—will be more than sufficient to make PHH's pretended concern over this issue moot.

### Claims under 12 USC § 2605 as implemented by 12 CFR § 1024.35

Defendant PHH asserts in bold but woefully unsupported terms that plaintiffs' claims made pursuant to "12 [CFR] § 1024.35 fail because plaintiffs do not have a private right of action to enforce its provisions." PHH cites a case from the District of Colorado it falsely hales as evidence that "district courts within the Tenth Circuit are split on this question," while imploring that the Court join this Colorado opinion "and courts throughout the country finding 12 C.F.R. 1024.25 [*sic*] does not create a private cause of action."

Notably, the only opinion cited in support of the notion that "courts throughout the country" are striking down claims related to 12 CFR § 1024.35 left and right is a single unpublished decision from the Eastern District of Virginia where these defendants managed to sell this argument to defeat the claims of a lone *pro se* plaintiff who did not

even file a responsive brief.  *See Brown v. Bank of New York Mellon, et al.*, 2016 WL 2726645, at *1 (E.D. Va. May 9, 2016).

The argument largely stems from what appears to be a patent misunderstanding—if not a blatant misstatement—of 12 CFR § 1024.35's place within the regulatory scheme that implements and supports the statutory provisions of RESPA, "Regulation X." *See* 12 USC § 2601 *et al*; 12 CFR § 1024.1 *et al*.  While it is obvious from a surface-level reading of 12 CFR § 1024.35 that a private cause of action is not expressly provided within the regulation itself, the private cause of action flows from the statutory provision the regulation draws authority from and supplements: 12 USC § 2605.

12 USC § 2605(e) provides the procedures and substantive rules servicers of federally related mortgage loans must comply with in adequately responding to a "qualified written request" from a borrower or "an agent of the borrower."  A qualified written request is nothing more than a "written correspondence" that:

> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
>
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 USC § 2605(e)(1)(B).  On top of setting time limitations that servicers adhere to in providing timely responses to written requests from borrowers, the statutory scheme requires servicers to "make appropriate corrections" after conducting an investigation, and provide the requesting borrower a written explanation of their investigation, of corrections made, and the information relied upon in making those corrections (or the information that showed no error occurred).  12 USC § 2605(e)(2)(B).

A servicer's failure to comply with the requirements placed upon it in responding to a borrower's written requests or notices of errors subjects such servicer to liability for—in an action brought by an individual—"any actual damages to the borrower as a result of the failure" and "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000." 12 USC § 2605(f)(1); *see also Lacey v. Ocwen Loan Servicing, LLC*, No. 6:13-cv-1418-EFM-KMH, 2014 WL 2885471, *3 (D. Kan. June 25, 2014) (Melgren, J.) (holding plaintiff adequately pled RESPA claim against Ocwen and GMAC Mortgage, LLC based upon their failure to respond to or correct notices of errors  in plaintiff's account, and that plaintiff's damages in the form of "emotional distress" were "sufficient to satisfy the actual damage requirement" under 12 USC 2605(e)).

More importantly, Congress expressly carved out authority to the Consumer Financial Protection Bureau ("CFPB") to "establish any requirements necessary to carry out this section."  12 USC § 2605(j)(3).  This is further read in conjunction with the statute's additional provisions under subsection (k)(1) stating that a servicer shall not:

> (C)    fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer duties; [or]
>
> . . .
>
> (D)    fail to comply with any other obligation found by the [CFPB], by regulation, to be appropriate to carry out the consumer protection purposes of this chapter."

In enacting 12 CFR 1024.35, the CFPB expressly stated as part of its final rule making that:

> Section 1024.35 implements section 6(k)(1)(C) of RESPA, and to the extent the requirements are also applicable to qualified

30

> written requests, sections 6(e) and 6(k)(1)(B) of RESPA. Pursuant to the Bureau's authorities under sections 6(j), 6(k)(1)(E), and 19(a) of RESPA, the Bureau is also adopting certain additions and certain exemptions to these provisions. . . . [T]hese additions and exemptions are necessary and appropriate to achieve the consumer protection purposes of RESPA, including ensuring responsiveness to consumer requests and complaints and the provision and maintenance of accurate and relevant information.

Bureau of Consumer Financial Protection, "Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z)," 78 Fed. Reg. 10696, at 10737 (Feb. 14, 2013).

12 CFR § 1024.35(b) defines the various "covered errors" within a written notice that places substantive requirements on servicers in responding to, including:

> (1)    Failure to accept a payment that conforms to the servicer's written requirements for the borrower to follow in making payments;

> (2)    Failure to apply an accepted payment to principal, interest, escrow, or other charges under the terms of the mortgage loan and applicable law;

> (3)    Failure to credit a payment to a borrower's mortgage loan account as of the date of receipt in violation of 12 CFR 1026.36(c)(1);

> . . .

> (6)    Failure to provide an accurate payoff balance amount upon a borrower's request in violation of 12 CFR 1026.36(c)(3); [and]

> . . .

> (11)    Any other error relating to the servicing of a borrower's mortgage loan.

Upon written notice of any such "covered errors," a servicer is required to conduct "a *reasonable* investigation" of such errors, correct such errors (or different or additional

errors discovered during a reasonable investigation), and provide the borrower accurate information concerning the actions taken and documents relied upon by the servicer.  12 CFR § 1024.35(e) (emphasis added).

Courts "around the country" have repeatedly found that claims pursuant to 12 USC § 2605 as supplemented by 12 CFR § 1024.35 are perfectly actionable against servicers. *See Denton v. Nationstar Mortg. LLC*, 2020 WL 1919133, at *9 (N.D. Okla. April 20, 2020) (citing CFPB interpretation of its regulations, held servicer's argument that 12 CFR 1024.35 "does not provide a private cause of action" erroneous, as claims were brought pursuant to 12 USC § 2605 "as clarified by the implementing regulations found" at 12 CFR § 1024.35); *Lucas v. New Penn Financial, LLC*, Civil Action No. 17-cv-11472-ADB, 2019 WL 404033, at *4 (D. Mass. Jan. 31, 2019) (holding "12 U.S.C. § 2605(f) provides a cause of action for violations of 12 C.F.R. § 1024.35"); *In re Coppola*, 596 B.R. 140, 156-57 (D.N.J. 2018) (holding borrower stated claims against servicer under 12 CFR 1024.35(b)'s catch-all provision requiring servicer to respond to written requests for "errors relating to the servicing of a borrower's mortgage loan"); *McGahey v. Federal Mortgage Association*, 266 F.Supp.3d 421, 439 (D. Maine 2017) (holding borrower stated claim against PHH under RESPA through alleged violation of 12 CFR 1024.35(b)(7) where servicer failed "to provide accurate information to a borrower regarding loss mitigation options"); *Renfroe v. Nationstar Mortgage, LLC*, 822 F.3d 1241, 1245 (11th Cir. 2016) (holding borrower stated claim against servicer for unreasonable investigation that failed to produce written explanation in response to borrower "in violation of 12 U.S.C. § 2605(e)(2)(B) and 12 C.F.R. § 1024.35(e)(1)(i)(B)" and related provisions).

The District of Colorado opinion PHH cites in support of its claim that there is a split of opinion within the Tenth Circuit on this question— *Christenson v. CitiMortgage,*

*Inc.*, 255 F.Supp.3d 1099 (D. Col. 2017)—lends no support for this conclusion.   The

*Christenson* opinion's commentary on the RESPA regulation at issue clearly does not line

up with PHH's characterization:

> 12 C.F.R. § 1024.35 is a regulation that merely fleshes out a
> servicer's obligations under § 2605(k)(1)(C).   [citation
> omitted].   In particular, it expands the kinds of "errors" a
> borrower can complain about and therefore the types of
> notices a servicer must respond to under § 2606(k)(1)(C).
> [citation omitted].   It also states that if a borrower gives a
> servicer written notice asserting a covered type of error then
> the servicer "shall comply with the requirements of this
> section"—i.e. various procedural hurdles governing how a
> servicer must respond.

*Christenson*, 255 F.Supp.3d at 1107-08.   The opinion ultimately dismissed the plaintiffs'

RESPA claims for the simple reason that "plaintiffs [did] not allege that defendant

violated any specific subsection of 12 C.F.R. § 1024.35."   *Id.*   Moreover, the Tenth Circuit

has previously discussed 12 CFR § 1024.35 as imposing additional substantive

requirements on the duties servicers must adhere to in responding to notices of error

under 12 USC § 2605 of RESPA.   *See Warren v. Green Tree Servicing, LLC*, 663 Fed.

Appx. 703, 705 (10th Cir. Oct. 18, 2016).

Just a month before the instant motion was filed, the Second Circuit released an

incredibly on-point decision in *Naimoli v. Ocwen Loan Servicing, LLC*, 22 F.4th 376 (2nd

Cir. 2022), explaining in extensive detail that an interpretation the same defendants

herein ascribed to 12 CFR 1024.35's provisions was erroneous.   In *Naimoli*, the plaintiff

asserted claims under RESPA against Ocwen Loan Servicing, LLC (now PHH), alleging

that Ocwen had mismanaged the handling of original loan documents it received by

failing to record them because "Ocwen had refused to pay the required recording fees."

*Naimoli*, 22 F.4th at 381.   The plaintiff based her action on Ocwen's  inadequate response

to her notices of this error sent pursuant to 12 CFR § 1024.35(b)(11) that cited Ocwen's failure to record those documents, which further resulted in a denial of her loan modification agreement. *Id.*

Rather than asserting 12 CFR 1024.35 did not provide a cause of action to borrowers whatsoever, Ocwen more narrowly argued that the plaintiff's specific notices of error were not "covered errors" under the regulation's "catch-all provision" at subsection (b)(11).[4]  The Second Circuit reversed the district court's decision granting Ocwen's summary judgment motion on this issue.  Citing the CFPB's amicus brief submitted on the issue—as well as the court's own common sense reading of the applicable RESPA provisions—the Second Circuit found that a servicer is necessarily responsible for the proper handling and recording of loan documents, thus making it a "covered error." *Id.* at 382–84.  The plaintiff's allegations that she suffered damages resulting from Ocwen's failure to "correct[ ] the error" or "conduct[ ] a reasonable investigation" after receiving her written notices stated claim for relief under RESPA. *Id.* at 382–86.

If no private cause of action existed pursuant to violations of 12 CFR § 1024.35 as PHH alleges, servicers of mortgage home loans could satisfy their duties by performing and relying upon a wholly unreasonable and deficient investigation of a borrower's alleged errors.  So long as they would provide some response within the time frame expressly contemplated under 12 USC 2605, a servicer could simply "provide an explanation" as to why no error occurred "as determined by the servicer," even if such an

---

[4] 12 CFR § 1024.35 provides that "any . . . error relating to the servicing of a borrower's mortgage loan" constitutes a "covered error" that, when raised in a borrower's written notice of error, requires servicers to observe RESPA's requirements in providing an adequate response.

34

explanation was either a bold-faced lie or the servicer did not in fact perform an investigation at all.  While an incredibly large servicer of mortgage loans such as PHH would happily accept such an interpretation—which would shield them from any and all legal exposure resulting from aggrieved borrowers subject to those practices—the interpretation is simply wrong.

In the present case, plaintiffs have alleged that PHH failed to provide accurate and timely disclosures regarding the servicing of their mortgage, which resulted from failing to reasonably investigate and provide adequate responses to written notices of error.  *See* Compl. ¶ 96.  It is further alleged that these deficiencies resulted in plaintiffs paying more than they otherwise should have in satisfying their mortgage loan, that they received no refund from such overpayments, and that PHH's subsequent responses to plaintiffs' written notices of error regarding the recording of their mortgage release were based on an unreasonable investigation that ultimately resulted in an invalid release of their mortgage being recorded.  *See id*. ¶¶ 59-62, 72-73, 82-83, 92-93.

For the purposes of a motion to dismiss, plaintiffs have satisfied Rule 8's pleading requirements in stating claims under RESPA as supplemented by 12 CFR 1024.35.  Again, to the extent further clarification or facts may be necessary to permit the defendants to provide a response to these allegations (which they had no apparent concern in doing as to plaintiffs' original Complaint) Plaintiffs defer to their proposed Second Amended Complaint (Exhibit A).

Before moving on, plaintiffs would briefly note they are abandoning their claims pertaining to both 12 CFR § 1024.38 (general servicing policies, procedures, and requirements) and 12 USC 2605(b) and (c) (notices of transferor and transferee servicers

of loan servicing at time of transfer).   The plaintiffs' proposed Second Amended Complaint reflects this as well.

## C. THE KANSAS CONSUMER PROTECTION ACT CLAIMS

Because plaintiffs' claims brought under the Kansas Consumer Protection Act ("KCPA") are largely focused upon the defendants' practices from 2020 and onward, plaintiffs have little concern in accepting the exhaustively briefed point that defendants' deceptive and unconscionable practices pre-dating July 1, 2019 cannot serve as the basis for a cause of action under the KCPA.   However, as defendants themselves admit—albeit, in the most evasive manner possible—effective July 1, 2019, the KCPA was amended to ensure "lending institutions" and "their affiliates" may squarely fall within the definition of "suppliers" subject to its provisions.

The only remaining argument the defendants make as to the plaintiffs' KCPA claims is precisely where they abandon any sense of the appropriate usage of a 12(b)(6) motion for failure to state a claim entirely.   Defendants harp along in conclusory fashion that plaintiffs "fail to show they are aggrieved consumers" of any of their deceptive and unconscionable practices.   Defendants disregard the well-established principle that litigants are not expected to "*show*" their damages at the pleading stage.   FRCP 8(a)(2). Instead, a complaint only requires "sufficient factual matter . . . to state a claim plausible on its face" beyond the simple "the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Like any other borrowing party under a mortgage agreement, the bargain plaintiffs entered more than twenty-years ago in signing their mortgage agreement was that upon full payoff of their loan obligations, they would be entitled to a *valid* release of their mortgage, and that the title to their property would be free and clear of the same.

However, upon the plaintiffs' full payoff of their loan in December of 2020, the defendants repeatedly failed to demonstrate any sense of obligation toward fulfilling their end of that bargain.

First, defendants' practices clearly resulted in the needlessly increased delay of any release being filed at all by outsourcing their obligation to do so to Defendant Indecomm Global Services ("Indecomm").   Compl. ¶¶ 85-86.   Defendants allowed employees of Defendant Indecomm—who were clearly not equipped with any accurate or verifiable information concerning the plaintiffs' loan—to falsely sign and notarize a patently incorrect release for subsequent filing with the Grant County Register of Deeds Office. Compl. ¶ 66, 68.  PHH's employees did not appear to care at all when plaintiffs called to inform them of the Register of Deed's rejection of that release, and only appeared motivated to act when the Office of the Kansas Banking Commissioner sent correspondence to them on the matter on the plaintiffs' behalf.  Compl. ¶¶ 71-72.

When PHH's representatives first gave a response to this notice of error, instead of owning up to the clearly defective nature of the first release, they made a blatant misrepresentation that "[a]s per [PHH's] records, there is no recorded assignment from Bank One to Bank of New York (BONY)" and that no error occurred despite all evidence pointing to the contrary.  Compl. ¶ 73.

Defendants argue that "Plaintiffs plead no facts demonstrating that they were even aware of PHH's communications to the Kansas State Banking Commissioner regarding the satisfactions of mortgage," but cite no reason to assume they were not.   Moreover, defendants' attempt to minimize this misrepresentation by arguing plaintiffs "*did not* rely on Defendants['] statements" shows no awareness for the standards of liability expressly contained within the KCPA itself.  As K.S.A. 50-626(b) expressly states, an actionable

claim for a deceptive act or practice enumerated within subsection (b) of the KCPA may be asserted "whether or not any consumer has in fact been misled."  These *per se* violations include "the willful use, in any oral or written representation, of . . . falsehood, innuendo, or ambiguity as to a material fact, and "the willful failure to state a material fact, or willful concealment, suppression or omission of a material fact."  K.S.A. 50-626(b)(2), (3).

Furthermore, a consumer may be "aggrieved"—as that term is used within K.S.A. 50-634(b)—where:

> [A consumer's] legal right is invaded by an act complained of or [whose] pecuniary interest is directly affected by the [court's] order.  This term refers to a substantial grievance, a denial of some personal or <u>property right</u>, or the imposition upon a party of some burden or obligation.

*Robbins v. Dyck O'Neal, Inc.*, 447 F.Supp.3d 1100, 1108, n. 6 (D. Kan. 2020) (*quoting Finstad v. Washburn University of Topeka*, 252 Kan. 465, 472, 845 P.2d 685 (1993)).  Under the terms of their mortgage agreement and by virtue of Kansas law, the Plaintiffs hold a protected interest in having the mortgagee of their loan file a release of their lien upon discharge of the debt, and the failure or negligence in doing necessarily harms their title in their property and the marketability thereof.  *See* K.S.A. 58-2309a.  They are aggrieved to the extent the defendants' practices and misrepresentations have harmed that protected property interest.

What the defendants purport to be oblivious to as it relates to the plaintiffs' claims generally is that the plaintiffs are not disputing that "the Mortgage Loan was a proper lien."  *See* Doc. 53, p. 19.  However, the recorded mortgage was only a proper lien right up until the point the plaintiffs paid their loan in full, and at that point, the plaintiffs were entitled to a *valid* and *timely* release of that lien.  As plaintiffs' First Amended Complaint

states, the defendants failed to ensure any release was filed shortly after payoff. Compl. ¶¶ 63-68. PHH then misrepresented material facts that its own records would have clearly reflected in order defend its vendor's patently incorrect release that was rejected for filing, increasing the delay in the filing of a corrected release. Compl. ¶ 73. As discussed further below, the Morals' complaint further alleges and supports that the release subsequently filed on March 1, 2021 was and still is invalid.

While it is true that the plaintiffs' First Amended Complaint in its current iteration focuses upon "the mechanics of [the two releases'] generation or execution," (i.e. the practices plaintiffs allege were deceptive and unconscionable) the "substance of the satisfaction" recorded on March 1, 2021 does not result in a validly and clearly released mortgage lien. *See* Doc. 53, p. 20. As plaintiffs' complaint states, the release ultimately filed by the defendants—after having already represented that their records showed no error occurred as to the information contained in the first rejected release—was executed by a different employee of Defendant Indecomm, "Chris Johnson," who was represented to be a "Vice President" of "Ocwen Loan Servicing, LLC."[5]  Compl. ¶ 78. This would not make any sense, as "Ocwen Loan Servicing, LLC" had already been merged out of existence into PHH two years prior. *See* Compl. ¶ 38-39.

The release purports that this nonexistent legal entity was acting as "Attorney in Fact" for "The Bank of New York Mellon Trust Company, N.A. As Successor to JPMorgan Chase Bank, N.A. as Trustee for <u>Residential Asset Mortgage Products, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2006-SP3</u>. Compl. ¶ 78. However, the last "mortgagee" of record that BNYM was purported to be acting as trustee on behalf of—

---

[5] The undersigned concedes he made the same error as his client he represents in confusing the corporate entity Chris Johnson was actually purporting to sign on behalf of in drafting their pleadings, an oversight sought to be corrected through the Second Amended Complaint offered by motion herein.

as gleaned through the assignments described by plaintiffs' complaint—went by a different name altogether: "RAMP 2006SP3." Compl. ¶ 17.

This is not the type of insignificant name change of the named-mortgagee that is analogous to the sudden appearance of a party's middle initial within an assignment of record that a title examination would view as perfectly harmless. *See Scott v. Kirkham*, 165 Kan. 140, 144–45, 193 P.3d 185 (1948) (discussing doctrine of *idem sonans*). "Similarity of names is sufficient to establish identity of person when there is no evidence to the contrary, and no suspicion has been cast upon the transaction." *Scott*, 165 Kan. at 145.

The discharge of a mortgage lien may only occur under Kansas law where a filed release has either been "signed by the mortgagee . . . such mortgagee's duly authorized attorney in fact, [or the] assignee of record," and regardless of the party that executes the instrument on the mortgagee's behalf, the "instrument [must] contain the name of the . . . mortgagee." K.S.A. 58-2306(a).

Other than the last assignment filed on June 15, 2009, none of the various assignments of record memorializing transfers between the lienholders of the plaintiffs' mortgage actually provide the name of the true mortgagee that Bank One, JPMorgan Chase & Co., and the Bank of New York Trust Company, N.A. served as trustee on behalf of. Compl. ¶¶ 14-17. These various assignments also failed to comply with the requirements of Kansas law requiring conveyances of property interests to or from trusts—even if conveyed "in the name of the trustee of that trust"—to include "the trust name . . .clearly set forth in the conveyance." *See* K.S.A. 58a-810.

The "trust" for which Defendant BNYM actually serves as trustee for is almost certainly an SEC registered mortgage-backed security ("RMBS") that contains pools of

numerous residential mortgage loans, including the Morals.  The Tenth Circuit provided a succinct explanation of the manner in which these RMBSs are created and administered in *American Fidelity Assurance Company v. Bank of New York Mellon*, 820 Fed.Appx. 684 (10th Cir. 2020) (unpublished):

> Securitization enables lenders to turn mortgage loans into cash.  The process generally involves four entities:  Seller, Depositor, Master Servicer, and Trustee.  The process begins when the Seller aggregates and sells a portfolio of mortgage loans to the Depositor.  The Depositor then sells the mortgages to a trust.  The trust pays for the mortgages by issuing certificates of beneficial ownership, which the Depositor then sells to investors.  The certificates entitle holders . . . to a share of interest and principal payments from the mortgage of borrowers.  The Master Servicer is responsible, in part, for collecting principal and interest payments from borrowers, transferring collected funds to the Trustee, and foreclosing on properties with defaulted loans.  The Trustee performs specified functions in administering the trusts and is responsible for delivering funds to certificateholders.

*American Fidelity Assurance Company*, 820 Fed.Appx at 686.

If the trust referred to as "RAMP 2006SP3" within the last recorded assignment of plaintiffs' mortgage lien is same trust as "Residential Asset Mortgage Products, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2006-SP3," there is no means to confirm this just by reference to the recorded loan documents.[6]  Moreover, the "certificates" of the trust BNYM serves as trustee for would only represent an intangible interest in the trust that may be sold to investors; they are not synonymous with the trust itself that held the plaintiffs' loan as mortgagee.

---

[6] Of course, plaintiffs' extended research as to the RMBSs Defendant BNYM actually serves as trustee for since the filing of this litigation has revealed a different explanation altogether; that *both* of these names fail to state actual name of the actual trust (i.e. the mortgagee) the plaintiffs' loan is actually associated with.

The defendants' assertion that "a recorded satisfaction of mortgage correctly stating the Mortgage Loan is paid off" is immaterial in definitively proving this recorded instrument has effectively released the lien if the release itself—in conjunction with the assignments of record thereof—were patently deficient in their execution. *See In re Southern*, 32 B.R. 761, 766 (D. Kan. 1983) (stating "cancellation of a mortgage on the record is not conclusive as to its discharge, or as to the payment of the indebtedness secured thereby"); *see also Jackson v. Pennymac Loan Services, LLC*, 205 Con.App. 189, 200-03, 257 A.3d 314 (2021) (holding that borrowers were sufficiently "aggrieved" by allegations that mortgagee had failed to timely file a release of their mortgage—as well as by allegations that mortgagee had not ultimately released mortgage in its own name—because "a homeowner who [gives] a warranty deed to an eventual buyer of the property has a legally protected interest in providing clear and marketable title to that property").

The underlying deficiencies within the assignments of record for the plaintiffs' mortgage, combined with the horrendous record-keeping practices of Defendant PHH and the blind-eye it took toward the mechanical drafting of releases thereof by Defendant Indecomm's employees—all of which are processes Defendant BNYM oversees in its capacity as trustee of the underlying RMBS—accumulated into what can only be described as a "big mess."  As alleged and supported by plaintiffs' complaint, the end result of this mess is a continuing cloud on the plaintiffs' title in their home.

Plaintiffs, like any other borrower of a home loan subject to these defendants' business practices, had no functional access to the defendants' insider knowledge of their agreements between one another or the problems surrounding the transfers in their mortgage.  The defendants' serial efforts to conceal and outwardly express ignorance toward a number of the material facts concerning the accuracy of the chain of title to

plaintiffs' mortgage—as well their clear unwillingness to reasonably and openly resolve those problems prior to attempting to file any release thereof—constitute practices harmful to bewildered consumers on the receiving-end. Plaintiffs feel confident in stating that the stacking of these deceptive and unconscionable practices upon one another have left them more than adequately "aggrieved" for the purpose of pursuing a recourse afforded to them as consumers through the provisions of the KCPA.

## D.  THE FRAUD CLAIM

The fraud claim in a nutshell: In May, 2017, Ocwen's agent represented to the Morals that there was nothing wrong with the second assignment of their mortgage and there was no need to file a corrective assignment. Ocwen *knew* this was false and the assignment was a phony. The plaintiffs relied upon Ocwen and their agent's law firm.

Defendant claims that the allegations as to fraud in the First Amended Complaint are not sufficiently pleaded under FRCP 9. Rule 9, of course, requires a plaintiff to plead fraud with particularity. One thing is clear however: Rule 9(b) does not supplant the principles of notice pleading under Rule 8, "which calls for pleadings to be 'simple, concise, and direct, ... and to be construed as to do substantial justice." *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997).

In cases with allegations of fraud or mistake, the court reads the two rules in conjunction. Thus, to satisfy Rule 9(b), "a complaint alleging fraud [must] 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006). In other words, the alleging party must specify the who, what, where, and when of the alleged fraud. *Jamieson v. Vatterott Educ. Ctr., Inc.*, 473 F. Supp. 2d 1153, 1156 (D. Kan. 2007).

Accordingly, the issue before the Court is whether the First Amendment Complaint alleges the who, what, when and where of the alleged fraud. The who is simple: the complaint in paragraphs 114-121, (pages 23-24, *supra*)  alleges the fraudulent conduct was committed by Ocwen. The "what" and "when" and "where" relates to the misrepresentations by Ocwen and its agent and are specifically described at paragraph 114-120.  Ocwen knew that title to the Morals' property was clouded and that there was a missing assignment. Their response (through their agent and former attorney in this case): your concerns are "without merit."  Ocwen *knew* this was a prevarication and the Morals relied upon it.

### *Fraud by Silence*

Fraud through silence appears so often in Kansas case law that the Judicial Council of Kansas has adopted a patterned instruction on its use.  P.I.K. 4th Civil 127.41 provides the elements of a fraud by silence claim as follows:

> The plaintiff claims fraud through silence on the part of the defendant. To constitute fraud by silence the plaintiff must prove:
>
> 1. The defendant had knowledge of material facts which plaintiff did not have and which the plaintiff could not have discovered by the exercise of reasonable diligence;
>
> 2. The defendant was under an obligation to communicate the material facts to the plaintiff;
>
> 3. The defendant intentionally failed to communicate to plaintiff the material facts;
>
> 4. The plaintiff justifiably relied upon the defendant to communicate the material facts to the plaintiff; and
>
> 5. The plaintiff sustained damages as a result of the defendant's failure to communicate this to the plaintiff.

> A fact is material if it is one to which a reasonable man would attach importance in determining his choice of action in the transaction in question.
>
> A party is justified in relying without investigation upon another to communicate the facts material to a transaction unless he knows or has reason to know of facts which make his reliance unreasonable.

Pattern Inst. Kan. 4th Civil 127.41.

The defendants' objection to this claim is related to the second element of a fraud by silence claim:  whether the defendants owed the plaintiffs a duty to communicate the material facts it had not disclosed.  The Kansas Supreme Court has described this duty as follows:

> Where on party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation to speak, and his silence constitutes fraud, especially when the other party relies upon him to communicate to him the true state of facts to enable him to judge of the expedience of the bargain.

*Ensminger v. Terminix Int'l Co.*, 102 F.3d 1571, 1574 (10th Cir. 1996).

As Judge Porfilio notes in *Ensminger*, the "[k]ey to this cause of action, we think, is the unequal relationship in which the claimant seeks particular information from a specialist upon which the recipient intends to rely or act." *Ensminger*, 102 F.3d at 1574. The issue in *Ensminger* was whether Terminix had a duty to disclose information about a termite infestation to homeowners.  *Id.* at 1573.  The court found that the Terminix employees know that home buyers rely on the termite inspection report in making their decision whether to purchase a home.  *Id.* at 1574.  Plaintiffs had no experience or ability

to detect termite activity themselves, and relied on the report supplied by the sellers and signed by Terminix. *Id.* at 1575.

Despite the defendants' equivocations to the contrary, they did indeed have a legal duty to plaintiffs to provide accurate and timely information concerning the validity of the recorded assignments of their mortgage *and* the owner of their loan under RESPA. Congress expressly imposed this obligation within 12 USC § 2605(k)(1)(C) by requiring servicers "to respond within 10 business days to a request from a borrower to provide the identity, address, and other relevant contact information about the owner or assignee of the loan." The CFPB further modified supplemented and refined this obligation under Regulation X. *See* 12 CFR § 1024.35(b)(11) and § 1024.36(d); *see also* 78 Fed. Reg. 10696, at 10752-55.

As plaintiffs' complaint notes, they raised concerns to Ocwen over the accuracy of the assignments of record for their mortgage and the ownership of their loan throughout 2015-2017. Compl. ¶ 29. On May, 12, 2017, Ocwen had its Kansas City counsel—Jonathan D. Nicol of Bryan Cave LLP—send the plaintiffs a letter responding to these concerns that stated in frank terms that their concern in requesting this information was "without merit." *Id.* at ¶ 34. Ocwen's internal records showed its employees knew there were in fact substantive problems with the assignments before and after this communication, and none of this was ever made known to the plaintiffs. Compl. ¶¶ 30, 32-36.

As for the defendants' contention that the information sought by plaintiffs in 2017 was "a matter of public record or readily available if a reasonable effort was made to ascertain them," Plaintiffs' current iteration of their complaint already shows that there was documentation known to Ocwen that could not possibly have been ascertained by plaintiffs by merely referring to the assignments of record at the time. Compl. ¶ 83.

Plaintiffs' Second Amended Complaint refines and supplements their claim with further supporting exhibits demonstrating how the truth behind the validity of specific assignments complained of is worse than the plaintiffs had even realized. *See*, Exhibit A.

Plaintiffs would further remind the defendants that this is not a foreclosure case. The plaintiffs have fully satisfied their payment obligations under the mortgage agreement and are not in default under its terms. The circumstances of this case are thus fundamentally distinguishable from the entirety of the caselaw defendants attempt to rely upon that would otherwise be robotically asserted in run-of-the-mill foreclosure actions to defeat the standing of a defaulting borrower arguing their home is being improperly foreclosed upon by the wrong party in interest.

Simply put, the publicly-recorded mortgage on plaintiffs' home was a proper lien *right up until it wasn't*. The moment plaintiffs paid their mortgage in full, they had a right to a properly executed and recorded release that would serve as an effective prophylactic to any doubts that the lien no longer clouds the title to their home. The plaintiffs' complaint expressly asserts and otherwise supports that the release of the plaintiffs' mortgage ultimately filed by the defendants fails to satisfy this essential purpose. Citing the readily-apparent inconsistencies within the chain pof title to the Plaintiffs' mortgage and the release ultimately filed, combined with the numerous deficiencies in the proper execution of those assignments and the release itself, the plaintiffs allege the lien has not been effectively released.

Rather than behaving in a commercially responsible manner by executing and recording corrective assignments or affidavits when afforded the opportunity, the defendants double-downed in the face of plaintiffs' concerns in 2017 by actively concealing evidence of systemic underlying problems concerning the assignments of

record for the mortgage and ownership of the note.  With the likely expectation that plaintiffs would simply default on their payment obligations in the long run, it is reasonable to conclude the defendants simply had no expectation these problems would ever result in tangible consequences.

As a result of the plaintiffs' unexpected shift in their financial condition allowing them to pay their loan in full in 2020, the defendants find themselves on the hook for explaining the myriad of problems leading to the ineffective release of the plaintiffs' mortgage lien.  Defendants had their opportunity to openly disclose and resolve those problems at a time plaintiffs were in no position to resolve them on their own.  Their refusal to do so as plaintiffs were being sold by their agent on a false explanation over the transfers in their mortgage was simply fraud.

## E.  The Slander of Title Claim

This cause of action is certainly not new to the courts of this District. According to Judge Brown, slander of title in this state is: "a false and malicious statement, oral or written, made in disparagement of a person's title to real or personal property, causing injury to that person."  *N. Nat. Gas Co. v. L.D. Drilling, Inc.*, No. 08-1405-WEB-DWB, 2010 WL 3892227, at *4 (D. Kan. Sept. 29, 2010) (citing *LaBarge v. City of Concordia*, 23 Kan.App.2d 8, Syl. ¶ 3, 927 P.2d 487 (1996).  He further noted that the Kansas Supreme Court has equated special damages with actual loss from the slander or defamation.  See *Hall v. Kan. Farm Bureau*, 274 Kan. 263, 50 P.3d 495, 504 (2002); *7240 Shawnee Mission Holding, LLC v. Memon*, No. 08-2207, 2009 WL 3185344 (D.Kan., Sept., 30, 2009) (citing *Watkins v. Conway*, 124 Kan. 79, 257 P. 937, 939 (1929)).

The false and malicious statement disparaging title is often shown by a filing of a document as a matter of record, which, of course, gives notice to the world. As the Kansas

Court of Appeals noted in *Saddlewood Downs v. Holland Corp., Inc.*, 33 Kan.App.2d 185, 196, 99 P.3d 640 (2004), the filing of a mechanic's lien encumbers real property and adversely affects the title. 33 Kan.App.2d at 197. Filing a patently insufficient mechanic's lien with the requisite malicious intent would give rise to a slander of title action. *See Comely–Neff Lumber Co. v. Ross*, 190 Kan. 734, 740, 378 P.2d 178 (1963). As with other state-of-mind determinations, the existence of malice supporting a slander of title action represents a factual finding. 33 Kan.App.2d at 196.

A recent case from our sister state of Missouri is instructive. In *Dumler v. Nationstar Mortg. LLC*, 585 S.W.3d 343 (Mo. Ct. App. 2019), the plaintiff argued that an invalid deed of trust on a homestead was a slander of title. The trial court found Nationstar liable for slander of title in that it "wrongfully declared an interest in the property by refusing to remove its claim to the title to the home and publishing those statements to the public through the Jackson County, Missouri Recorder of Deeds in the form of the Deed of Trust." *Id.* at 347. The Missouri Court of Appeals upheld the trial court's verdict also found that the plaintiff's testimony that she had been prevented from marketing her home due to Nationstar's lien supported an award of damages.

Defendants argue their phony releases are irrelevant and do not harm the plaintiffs. Paragraph 68 of the First Amended Complaint alleges that: Carlos was shocked when he was informed by the Register of Deeds that she had actually already received the exact same document prior, and had rejected it due to its clear inconsistencies with the purported assignments on file. Under Rule 12(b)(6), the defendant is bound by the plaintiffs' facts. They are not allowed to simply use their own facts to attempt to deny the plaintiffs their day in court.

## F. THE PLAINTIFFS' MOTION TO AMEND

The plaintiffs request that the Court consider their Second Amended Complaint in Ruling upon the defendants' motion to dismiss.  Pursuant to local rules, the Second Amended Complaint is attached as Exhibit A to this response and also to plaintiffs' motion to amend.  The purpose of this amendment is to address both misunderstandings and misstatements of the facts in defendants' Motion to Dismiss.  The complaint additionally attaches a number of exhibits demonstrating the fallacy of many of the arguments raised by the defendants.

Under Federal Rule of Civil Procedure 15(a)(2), once a responsive pleading has been filed, "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Rule 15(a)(2) provides that courts should "freely give leave when justice so requires."  As was noted in *Painter v. Midwest Health, Inc.,* No. 19-2336-DDC-ADM, 2020 WL 5016878, at *3 (D. Kan. Aug. 25, 2020):

> In freely allowing leave to amend, the court provides litigants with "the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." *Hardin v. Manitowoc–Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir. 1982). A court may only withhold leave to amend for reasons such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of [the] amendment.

Judge O'Connor noted years ago in *FDIC v. Berr*, 643 F.Supp 357 (D. Kan 1986), that prejudice under Rule 15 "means undue difficulty in prosecuting or defending a lawsuit as a result of a change of tactics or theories on the part of the other party, " citing *Deakyne v. Commissioners of Lewes*, 416 F.2d 290, 300 (3d Cir. 1969).  Judge O'Connor went on to note that the party opposing the amendment of the pleadings has the burden

50

of showing prejudice. *FDIC*, 643 F.Supp. at 359 (citing *Beeck v. Aquaslide 'N' Dive Corp.*, 562 F.2d 537, 540 (8th Cir. 1977)).

Along these lines, the Tenth Circuit has noted that prejudice under Rule 15 relates only to the ability to defend a case *on its merits*:

> Further, Rule 15(c)(3) speaks only of prejudice to a party's defense *on the merits*. *See, Nelson v. County of Allegheny*, 60 F.3d 1010, 1014-15 (3d Cir. 1995) ("The prejudice to which . . . Rule [15(c)] refers is that suffered by one who, for lack of timely notice that a suit has been instituted, must set about assembling evidence and constructing a defense when the case is already stale.") (quotation omitted); *see also Patton v. Guyer*, 443 F.2d 79, 86 (10th Cir. 1971) (applying prior Rule 15(c); noting that "invariably some practical prejudice results from an amendment," but proper question under Rule 15(c) is whether party's ability to prepare defense is prejudiced).

*Maycher v. Muskogee Med. Ctr. Auxiliary*, No. 97-7021, 1997 WL 698007, at *2 (10th Cir. 1997).

This case is in its infancy. There is no scheduling order yet entered since Indecomm is new to the case. There have been no depositions taken. Only very limited discovery has taken place. It is difficult to see any prejudice that would be suffered by the defendants in terms of a defense on the merits of this case.

The plaintiffs respectfully ask that their motion to amend be granted and the defendants' motion to dismiss be denied.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER LC

/s/Dylan P. Wheeler
Dylan P. Wheeler #28661
8301 E. 21st Street N., Suite 450
Wichita, KS 67206-2936
(316) 262-4000
Dylan@depewgillen.com
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of March, 2022, the above and foregoing

**Response to Defendants' Motion to Dismiss and Brief in Support of**

**Plaintiffs' Motion to Amend** was filed via ECF and notice sent to:

Justin M. Nichols
Isaac W. Straub
Kutak Rock LLP
2300 Main Street, Suite 800
Kansas City, MO 64108
*Attorneys for Defendants* PHH, BONY and Ocwen

Anthony J. Durone
Berkowitz Oliver LLP
2600 Grand Boulevard, Suite 1200
Kansas City, MO 64108

Philip D. Robben
Randall K. Morrison
Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
*Attorneys for Defendant Indecomm*

/s/Dylan P. Wheeler
Dylan P. Wheeler #28661